[Cite as *State v. Proby*, 2015-Ohio-3364.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 14AP-1067 |
| v. | : | (C.P.C. No. 14CR-760) |
| Kenneth C. Proby, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on August 20, 2015

*Ron O'Brien*, Prosecuting Attorney, and *Michael P. Walton*, for appellee.

*Mark G. Kafantaris*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Defendant-appellant, Kenneth C. Proby, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas pursuant to jury verdicts finding him guilty of theft, tampering with records, and forgery. For the following reasons, we affirm.

I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On February 13, 2014, appellant was indicted on one count of theft, in violation of R.C. 2913.02, a fifth-degree felony, two counts of tampering with records, in violation of R.C. 2913.42, third-degree felonies, and two counts of forgery, in violation of R.C. 2913.31, fifth-degree felonies. Appellant entered a not guilty plea to the charges and requested a jury trial, at which the following evidence was presented.

{¶ 3}  Appellant and Le'Kita Chambers were married in 2002.  At the time of the marriage, Le'Kita legally assumed appellant's surname and was thereafter known as Le'Kita Proby.  In December 2003, the couple purchased a home located at 3754 Ducat Street in Columbus.  The purchase was secured by a note and mortgage to Wells Fargo Home Mortgage, Inc. ("Wells Fargo").  It is undisputed that appellant and Le'Kita signed both the note and the mortgage.

{¶ 4}  In October 2006, the marriage between appellant and Le'Kita was terminated pursuant to a decree of dissolution.  The separation agreement, incorporated into the decree of dissolution, allowed appellant to retain possession of the home on the condition that he continued to make payments on the note, listed the home for sale at fair market value, and split any equity upon sale of the home with Le'Kita.  The decree of dissolution also included a provision legally changing Le'Kita's surname to Brown.

{¶ 5}  Appellant thereafter fell several months behind on the mortgage payments. Working with Wells Fargo, appellant was ultimately offered a "partial claims" modification whereby the United States Department of Housing and Urban Development ("HUD") would disburse $4,776.47 to cover the arrearage in exchange for a promissory note and subordinate mortgage lien on the property.  HUD's disbursement of the funds was contingent on both appellant and Le'Kita signing a Special Forbearance Agreement with Wells Fargo obligating them to make three on-time payments on the note demonstrating their financial fitness to warrant the modification.   The Special Forbearance Agreement was executed on September 15, 2007.  After three on-time payments were made, HUD disbursed the funds to Wells Fargo to cure the arrearage.  A Partial Claims Promissory Note and subordinate mortgage lien in favor of HUD were executed on December 17, 2007.  The subordinate mortgage includes a signature acknowledgement by a commissioned notary public in the state of Ohio.

{¶ 6}  Le'Kita testified that she first learned of the mortgage arrearage as part of a random credit check made by her employer in September 2007.  She thereafter initiated contempt proceedings in domestic relations court based on appellant's failure to comply with the terms of the separation agreement.  Although appellant produced documentation in the domestic relations court demonstrating that the mortgage was no longer in arrears, Le'Kita only later learned that this documentation consisted of the loan modification

documents from Wells Fargo and HUD.  In a January 2008 order, the domestic relations court found appellant in contempt and ordered him to, among other things, bring the first mortgage current, continue to pay the first mortgage, and actively market the property. The order further stated that "[a]t closing, petitioner-wife to receive from pet[itioner]-Husband[']s share of net proceeds $5000.00 for additional debt against property based upon husband[']s previous failure to pay."  (State's Exhibit L, 3.)

{¶ 7}    According to Le'Kita, she did not sign the Special Forbearance Agreement or the Partial Claims Promissory Note and subordinate mortgage and did not authorize appellant or anyone else to sign those documents on her behalf.  She specifically noted that both documents were signed "Le'Kita T. Proby" and that she would not have signed her name in this manner because her legal name at the time was Le'Kita T. Brown.  She further noted that the subordinate mortgage incorrectly stated that she and appellant were married. She acknowledged that the subordinate mortgage included a notary's certification; however, she denied signing the document.

{¶ 8}    Appellant testified that he agreed to assume the mortgage debt and accordingly signed the separation agreement because he did not want to encumber Le'Kita with marital debt because she had financial problems.  After the dissolution was finalized, he unsuccessfully attempted to sell the house and fell behind on the mortgage payments.  He and Le'Kita jointly agreed to proceed with the loan modification process in order to facilitate the sale of the house and preclude it from going into foreclosure. According to appellant, Le'Kita located a notary, and she and appellant signed the loan modification documents in the notary's presence.  However, because the documents listed Le'Kita's surname as Proby and she signed the documents using the surname Brown, the notary refused to certify her signature.  According to appellant, Wells Fargo had provided him two sets of the loan modification documents.  After appellant retrieved the second set of documents from his home, he and Le'Kita returned to the notary's office.  Le'Kita signed the second set of documents in the notary's presence, this time using the surname Proby.

{¶ 9}    Appellant ultimately failed to make the payments on the loan modification and the mortgage again went into arrears.  Because no quitclaim deed was ever recorded,

appellant and Le'Kita remained fee simple owners of the home until it went into foreclosure.

{¶ 10} In 2012, Le'Kita informed the prosecutor's office that appellant had forged her signature on the loan modification documents.  The prosecutor reported the allegations to HUD officials, who thereafter obtained handwriting exemplars from appellant, Le'Kita, and the notary.

{¶ 11} William T. Bennett, a retired handwriting analyst employed by the Columbus Division of Police for approximately 39 years, testified on direct examination in the state's case that he compared the handwriting exemplars obtained from appellant and Le'Kita to the signatures on the 2003 loan documents and the 2007 loan modification documents.  On May 7, 2013, Bennett issued two written reports in which he opined that (1) Le'Kita signed her name on the 2003 loan documents, (2) Le'Kita did not sign her name on the 2007 loan modification documents, (3) appellant signed his own name on the 2007 loan modification documents, (4) it was "highly probable" that appellant signed Le'Kita's name on the 2007 loan modification documents, (5) it was "very likely" that appellant signed the names of the two witnesses listed on the 2007 loan modification documents, and (6) the notary signed her own name on the 2007 subordinate mortgage. (State's Exhibit N.)  When asked to explain the terms of art used in describing the opinions set forth in his written report, Bennett averred, "Well, there's different levels. Positive is about as good as you get.  After that, highly probable, then you've got probable and then * * * very likely, likely."  (Tr. Vol. I, 218.)

{¶ 12} Bennett went on to explain that because appellant's handwriting exemplar did not include the cursive form of Le'Kita's first name, he could not opine as to whether appellant signed Le'Kita's first name on the loan modification documents; however, he opined that appellant signed Le'Kita's middle initial, "T.," and her former last name, "Proby." (Tr. Vol. I, 227.)

{¶ 13} When asked on cross-examination whether the opinion in his report that Le'Kita did not sign the loan modification documents meant that he was "positive" she did not do so, Bennett responded "Yes."  (Tr. Vol. I, 256.)  When questioned whether the opinion in his report that it was "highly probable" that appellant signed Le'Kita's name on

the loan modification documents referred to her full name or to only the "T. Proby" portion of her name, Bennett responded:

> Let me put it this way.  I explained to the prosecutor earlier before we came in here today that my opinion has changed a little bit since then. * * * [B]efore I said highly probable because I wasn't sure about the first name.  But all the time I spent putting this together for trial and everything, of course, I have to go back over everything and basically do the examination again to get it fresh in my mind.  And I changed my opinion from highly probable on here to basically I don't know for sure on the first name; but the middle initial and last name, yes, he did do.

(Tr. Vol. I, 259.)

{¶ 14} Bennett acknowledged that handwriting analysis is not "an exact science"; rather, it is "opinionated."  (Tr. Vol. I, 260.)  He also acknowledged that determining whether a signature has been forged is easier than determining who forged the signature; accordingly, he was able to opine that he was "positive" Le'Kita did not sign her name on the loan modification documents.  (Tr. Vol. I, 260.)  However, when asked if he was less confident about who signed Le'Kita's name on those documents, he responded, "I don't have any problem with my confidence on this."  (Tr. Vol. I, 260.)  Expounding on his response, Bennett stated that his "highly probable" opinion in the report "dealt more with that first name.  When I do away with the first name, just go with the last name, I don't have a problem with it." (Tr. Vol. I, 260-61.)

{¶ 15} On redirect examination, Bennett explained that although he could not identify appellant as the person who signed Le'Kita's first name, he felt "quite comfortable" identifying appellant as the person who signed the "T. Proby" portion of Le'Kita's name.  (Tr. Vol. I, 267.)  He stated on recross-examination that "the difference between positive and highly probable is very minute."  (Tr. Vol. I, 269.)

{¶ 16} On further redirect examination, the prosecutor asked Bennett "if we would ask you what's your opinion as to whether or not [appellant] wrote out Le'Kita T. Proby, would your answer still be highly probable?"  (Tr. Vol. I, 271.)  Bennett responded, "As far as Le'Kita, I'd say, very capable.  As far as T. Proby, I'd say, yes, he did do it."  (Tr. Vol. I, 271.)  The prosecutor then averred, "I guess the reason I'm asking you that is I'm trying to understand, you're breaking it down between Le'Kita and T. Proby now when we've been

testifying in court today.  At the time you wrote the report you didn't make that distinction.  And I'm just wondering is there a difference in opinion or is it that we're focusing on one part of the signature versus the other now?"  (Tr. Vol. I, 271.)  To this query, Bennett responded, "No.  I think it's a difference in opinion."  (Tr. Vol. I, 271.)

{¶ 17} Following Bennett's testimony, defense counsel moved for a mistrial.  After a lengthy discussion with defense counsel and the prosecutor, the particulars of which are outlined in detail in our discussion of the first assignment of error, the trial court denied the motion.

{¶ 18} At the conclusion of trial, the jury found appellant guilty on all five counts in the indictment.  The trial court issued a judgment entry consistent with the jury's verdicts and imposed a sentence in accordance with law.

## II.  ASSIGNMENTS OF ERROR

{¶ 19} In a timely appeal, appellant asserts the following three assignments of error:

> [I.] The trial court erred to the prejudice of appellant when it denied his motion for mistrial predicat[e]d on the state's Crim.R. 16(K) violation regarding the changed opinion of its handwriting expert.
>
> [II.] Appellant's convictions for one count of theft; two counts of tampering with records; and two counts of forgery in violation of R.C. 2913.02, R.C. 2913.42 and R.C. 2913.31, respectively, are based upon insufficient evidence.
>
> [III.] Appellant's convictions for one count of theft; two counts of tampering with records; and two counts of forgery in violation of R.C. 2913.02, R.C. 2913.42 and R.C. 2913.31, respectively, are against the manifest weight of the evidence.

## III.  DISCUSSION

### A.  First Assignment of Error – Mistrial

{¶ 20} In his first assignment of error, appellant argues that the trial court abused its discretion when it denied his motion for mistrial based on the prosecutor's failure to comply with the requirements of Crim.R. 16(K) regarding Bennett's testimony.  Appellant asserts he was prejudiced by the prosecutor's failure to timely inform him of a change in Bennett's expert opinion.

{¶ 21} As noted above, Bennett testified on direct examination in the state's case that he opined in two written reports issued in May 2013 that Le'Kita did not sign the loan modification documents and that it was "highly probable" that appellant signed Le'Kita's name on those documents. He then averred that because appellant's handwriting sample did not include the cursive form of Le'Kita's first name, he could not opine as to whether appellant signed "Le'Kita" on the documents; however, he could opine that appellant signed Le'Kita's middle initial (T.) and her former last name (Proby). (Tr. Vol. I, 227.)

{¶ 22} On cross-examination, Bennett testified that he told the prosecutor before he came in to testify that he changed his opinion "a little bit" since he issued the written reports and used the term of art "highly probable" in his written report because he was not certain that appellant signed Le'Kita's first name. (Tr. Vol. I, 259.) After re-examining the loan modification documents and the handwriting exemplars, he changed his opinion from "highly probable" to "basically I don't know for sure on the first name; but the middle initial and last name, yes, he did do." (Tr. Vol. I, 259.) Following this statement, Bennett averred that he did not draft a new report; rather, he told the prosecutor about it "this morning" and was told to "testify to it the way that you believe." (Tr. Vol. I, 260.)

{¶ 23} Bennett averred on recross-examination that he changed his expert opinion "probably [a] couple days ago" and told the prosecutor about the change "[t]his morning." (Tr. Vol. I, 269.) He further averred that when he was told the case was going to trial, he "basically had to do the examination again" and acknowledged that it would have been "a good idea" to let the prosecutor know before the trial started that he had changed his opinion. (Tr. Vol. I, 270.) On re-direct examination, Bennett characterized his testimony as constituting a "difference in opinion." (Tr. Vol. I, 271.)

{¶ 24} Following Bennett's testimony, the court adjourned for the evening. When trial commenced the next morning, defense counsel, outside the jury's presence, moved for a mistrial based on the prosecutor's alleged failure to comply with Crim.R. 16(K). In particular, defense counsel argued that Crim.R. 16(K) obligated the prosecutor to advise the defense of any changes to Bennett's May 2013 written reports. Defense counsel averred that if he had known of the change in Bennett's opinion, "we may have made a different decision here, or I could hire an expert to say is this really accurate and then

make a decision at that point."  (Tr. Vol. II, 280.)  Defense counsel further stated, "[t]he prosecutor knew.  We could have called a timeout in the trial and figured out something. * * * Allowing us to be ambushed with that information in front of the jury is prejudicial, it's prosecutorial misconduct, it's unconstitutional."  (Tr. Vol. II, 280-81.)

{¶ 25}  In response, the prosecutor averred that when he conferred with Bennett in the morning prior to Bennett testifying, Bennett for the first time explained his difficulty in determining whether appellant had signed Le'Kita's first name on the loan modification documents.  According to the prosecutor, Bennett stated that "I feel conclusively that [appellant] did the T. Proby but I can't make the Le'Kita."  (Tr. Vol. II, 282.)  The prosecutor understood Bennett's statement to mean that he "was giving me further information about why he reached highly probable on his report, was because the one word he could make, the one word he couldn't.  And so, therefore, he was saying highly probable for that Le'Kita Proby."  (Tr. Vol. II, 282.)  The prosecutor further stated, "I don't think on direct he said anything about changing his opinion to say that T. Proby was conclusive and that he was conclusive now on apparently the whole thing.  I don't know that we even clarified exactly what he was conclusive about except now it may be that it's the T. Proby."  (Tr. Vol. II, 282-83.)  The prosecutor further averred that when he spoke with Bennett, "it did not occur to me that this was a change of opinion.  It occurred to me that he was telling me this is why I have this opinion but he hadn't said that specifically in his report and so I didn't tell [defense counsel]."  (Tr. Vol. II, 283.)

{¶ 26}  The trial court then asked defense counsel to articulate how appellant had been prejudiced by the change in Bennett's opinion.  The court specifically averred:

> Because, I mean, the fact that he testified that he changed his opinion actually works, I think, to your favor.  I mean, it calls into question all the work that he's done up to this point on the one hand, and rather than saying the entire name that it was probable, by parsing it out now saying, well, now I can't really tell based upon the first name and I'm only looking now at the last, the middle, the last name, probably works to your benefit, at least from my recollection of the testimony.
>
> I mean, the fact that it came in late, the fact that it came in at trial, yes, is of concern; but, at least the cases that I've had an opportunity to review always talk about the prejudice that's

been derived by that and whether or not the results of the trial would have been different but for the information.

(Tr. Vol. II, 285-86.)

{¶ 27} After a brief recess, defense counsel argued that appellant was prejudiced by Bennett's changed opinion because appellant's trial strategy, and ultimately his decision to go to trial, was predicated at least in part on a report that indicated it was "highly probable" that appellant signed Le'Kita's name to the loan modification documents. Defense counsel noted that since "highly probable" was something less than the "high end," there was some "wiggle room there we intended to work with.  And then we heard the testimony unfold yesterday and it was anything but that."  (Tr. Vol. II, 288.)  Defense counsel further argued, "if that report had said 100 percent, I likely would have consulted my own expert and potentially called that person as a witness; but with a less than 100 percent report I didn't feel the need to."  (Tr.Vol. II, 291.)

{¶ 28} The trial court noted that despite efforts by both the prosecutor and defense counsel to coax Bennett to express his changed opinion using the terms of art positive, highly probable, probable, or very likely, he never did so; rather, he only would opine that he did not know whether appellant signed Le'Kita's first name and felt comfortable identifying appellant as the person who signed "T. Proby." The court ultimately concluded that although the prosecutor violated Crim.R. 16 insofar as he was aware of a potential change in Bennett's expert testimony and did not provide that information to the defense at the time he became aware of the potential change, appellant had suffered no resulting prejudice.

{¶ 29} An appellate court reviewing a trial court's decision on a motion for mistrial defers to the judgment of the trial court, as it is in the best position to determine whether circumstances warrant a mistrial. *State v. Glover*, 35 Ohio St.3d 18, 19 (1988). Accordingly, we review a trial court's decision on a motion for mistrial for an abuse of discretion.  *Columbus v. Aleshire*, 187 Ohio App.3d 660, 2010-Ohio-2773, ¶ 42 (10th Dist.), citing *State v. Sage*, 31 Ohio St.3d 173, 182 (1987).  The term abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable.  *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).  An abuse of discretion involves views or actions " 'that no conscientious judge, acting intelligently, could honestly have taken.' "  *State v.*

*Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 130, quoting *State ex rel. Wilms v. Blake*, 144 Ohio St. 619, 624 (1945).

{¶ 30} " 'A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected.' " *State v. Walburg*, 10th Dist. No. 10AP-1087, 2011-Ohio-4762, ¶ 52, quoting *State v. Reynolds*, 49 Ohio App.3d 27, 33 (2d Dist.1988). Rather, a trial court should only declare a mistrial when "the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991). In determining whether a criminal defendant was deprived of a fair trial, an appellate court must determine whether, absent the error or irregularity, "the jury would have found the [defendant] guilty beyond a reasonable doubt." *Aleshire* at ¶ 42, citing *State v. Maurer*, 15 Ohio St.3d 239, 267 (1984).

{¶ 31} Crim.R. 16 governs discovery in criminal prosecutions. *State v. Palmer*, 12th Dist. No. CA2013-12-243, 2014-Ohio-5491, ¶ 37, citing *State v. Wilson*, 12th Dist. No. CA2012-12-254, 2013-Ohio-3877, ¶ 14. As to expert witness testimony, Crim.R. 16(K) provides:

> **Expert Witnesses; Reports.** An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

{¶ 32} The purpose of Crim.R. 16(K) " 'is to avoid unfair surprise by providing notice to the defense and allowing the defense an opportunity to challenge the expert's findings, analysis, or qualifications, possibly with the support of an adverse expert who could discredit the opinion after carefully reviewing the written report.' " *State v. Fetty*, 11th Dist. No. 2011-P-0091, 2012-Ohio-6127, ¶ 36, quoting *State v. Perry*, 11th Dist. No. 2011-L-125, 2012-Ohio-4888, ¶ 55.

{¶ 33} Pursuant to Crim.R. 16(L)(1), when a party fails to provide discovery, the trial court may, inter alia, grant a continuance, prohibit the party from introducing into evidence the undisclosed material, or make any other order it deems just under the circumstances. *State v. Schuttinger*, 10th Dist. No. 12AP-705, 2013-Ohio-5793, ¶ 12. Whether to impose sanctions for a party's failure to comply with discovery rules is subject to abuse of discretion review. *Id.*, citing *State v. Harcourt*, 46 Ohio App.3d 52 (12th Dist.1988), paragraph one of the syllabus.

{¶ 34} In addition, "[p]rosecutorial violations of Crim.R. 16 are reversible only when there is a showing that (1) the prosecution's failure to disclose was a willful violation of the rule, (2) foreknowledge of the information would have benefited the accused in the preparation of his defense, and (3) the accused suffered some prejudicial effect." *State v. Joseph*, 73 Ohio St.3d 450, 458 (1995); *see also State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 131.

{¶ 35} In the present case, the trial court found that the prosecutor's failure to immediately notify appellant of Bennett's changed opinion was a violation of Crim.R. 16(K). Assuming, arguendo, that the trial court properly so found, we nonetheless find that the trial court did not abuse its discretion in refusing to grant appellant's motion for mistrial because of the prosecutor's failure to strictly comply with Crim.R. 16(K). First, although the prosecutor's failure to disclose was willful in the sense that he did not immediately notify defense counsel about Bennett's changed opinion, the prosecutor explained that in his discussion with Bennett immediately prior to Bennett's testimony, he believed that Bennett was merely explaining how he had arrived at a conclusion of "highly probable" in his written report. The prosecutor averred that he did not inform defense counsel because it did not occur to him that what Bennett told him constituted a change of opinion; rather, the prosecutor interpreted Bennett's statements as an expansion of the opinion set forth in his written reports.

{¶ 36} Even if the prosecutor willfully violated the rule, appellant has failed to demonstrate that foreknowledge of Bennett's changed opinion would have benefited him. Appellant argues that had he known of Bennett's changed opinion, he would have obtained his own handwriting expert and reconsidered his entire trial strategy. However, as Bennett testified, the difference between "positive" and "highly probable" is "very

minute." (Tr. Vol. I, 269.) Appellant does not explain why an opinion of "positive" would have prompted him to obtain his own expert but the opinion of "highly probable" did not.

{¶ 37} Finally, appellant has failed to show that he was prejudiced by Bennett's changed testimony. As noted by the trial court, Bennett never testified that he was "positive" that appellant had signed the "T. Proby" portion of Le'Kita's name to the loan modification documents. Rather, he opined only that he did not know whether appellant signed Le'Kita's first name and felt comfortable identifying appellant as the individual who signed "T. Proby." Moreover, and as further noted by the trial court, Bennett's changed opinion likely benefited appellant, as it called into question Bennett's credibility and the validity of his written reports. Defense counsel repeatedly made this point through vigorous and thorough cross-examination of Bennett and during closing argument.

{¶ 38} In short, because appellant has failed to satisfy all three prongs of the *Joseph/Jackson* test, no reversible error occurred in the denial of appellant's motion for mistrial based on the prosecutor's Crim.R. 16 violation. Accordingly, we need not disturb the trial court's decision to deny appellant's motion for mistrial. *See State v. Anderson*, 10th Dist. No. 08AP-1071, 2009-Ohio-6566, ¶ 27 ("Because appellant cannot satisfy all three *Jackson* prongs, we discern no reversible error from the prosecution's Crim.R. 16 violation."). The first assignment of error is overruled.

### B.    Second and Third Assignments of Error – Sufficiency and Manifest Weight of the Evidence

{¶ 39} In his second and third assignments of error, respectively, appellant argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.

{¶ 40} "Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 36, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In reviewing a challenge to the sufficiency of the evidence, an appellate court must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 41} "While sufficiency of the evidence is a test of adequacy regarding whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *Cassell* at ¶ 38, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 25, citing *Thompkins* at 386. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). This discretionary authority " 'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *Martin* at 175.

{¶ 42} Furthermore, " '[w]hile the jury may take note of inconsistencies and resolve or discount them accordingly, * * * such inconsistences do not render defendant's conviction against the manifest weight or sufficiency of the evidence.' " *State v. Gullick*, 10th Dist. No. 13AP-317, 2014-Ohio-1642, ¶ 10, quoting *State v. Nivens*, 10th Dist. No. 95APA09-1236 (May 28, 1996). "A jury, as the finder of fact and the sole judge of the weight of the evidence and the credibility of the witnesses, may believe or disbelieve all, part, or none of a witness's testimony." *Id.*, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964). A conviction is not against the manifest weight of the evidence because the jury believed the state's version of events over the appellant's version. *Id.* at ¶ 11, citing *State v. Houston*, 10th Dist. No. 04AP-875, 2005-Ohio-449, ¶ 38. A reviewing court must give great deference to the jury's determination of witness credibility. *Id.*, citing *State v. Chandler*, 10th Dist. No. 05AP-415, 2006-Ohio-2070, ¶ 19.

{¶ 43} Appellant was convicted on one count of theft by deception, in violation of R.C. 2913.02, based on his procurement of funds from Wells Fargo and HUD using forged

documents. Appellant also was convicted on two counts of tampering with records, in violation of R.C. 2913.42, based on his uttering of Le'Kita's forged signatures on the loan modification documents submitted to Wells Fargo and HUD. In addition, appellant was convicted on two counts of forgery, in violation of R.C. 2913.31, stemming from his signing Le'Kita's name on the loan modification documents. Appellant does not argue that the state failed to present evidence establishing all the elements of the offenses for which he was convicted. Instead, appellant argues that a number of issues undermine his convictions and establish that the jury clearly lost its way in convicting him.

{¶ 44} Appellant acknowledges that his convictions all resolve to whether he forged Le'Kita's signature on the loan modification documents. Appellant argues that Le'Kita signed the loan modification documents but after appellant defaulted on the loan, she claimed that he forged her signature to avoid any financial responsibility on the note and mortgage. Appellant contends that the greater weight of the evidence compels this conclusion.

{¶ 45} Appellant acknowledges Le'Kita's testimony that she did not sign the loan modification documents. Appellant argues that while Le'Kita's denial was "compelling," it did not "withstand scrutiny" when considering the language in the domestic court's January 2008 order that "[a]t closing, petitioner-wife to receive from pet[itioner]-Husband[']s share of net proceeds $5000.00 for additional debt against property based upon husband[']s previous failure to pay." (Appellant's Brief, 14; State's Exhibit L, 3.) Appellant contends that this language demonstrates that Le'Kita knew in January 2008 that appellant had obtained approximately $5,000 to cure the first mortgage arrearage because she signed the loan modification documents in 2007. Appellant maintains that the 2008 domestic relations order corroborates his testimony that Le'Kita signed the documents.

{¶ 46} Contrary to appellant's argument, the language in the 2008 domestic relations order does not establish that Le'Kita signed the loan modification documents or even knew the documents existed. The domestic relations order does not expressly identify the loan modification documents. Further, although Le'Kita testified that appellant produced documentation in the domestic relations court demonstrating that the mortgage was no longer in arrears, she averred that the documentation consisted of "a

printout that you get online [from] Wells Fargo * * * showing payments received."  (Tr. Vol. II, 338.)   She further testified that she only later learned that the documentation appellant produced consisted of the loan modification documents from Wells Fargo and HUD.

{¶ 47} Moreover, on cross-examination, Le'Kita testified that although there was some discussion about $5,000 at the contempt hearing, that discussion was not related to the additional debt incurred by appellant in obtaining the loan modification.  Rather, the $5,000 figure was just part of the agreement worked out between counsel for Le'Kita and counsel for appellant pertaining to appellant's failure to pay certain debts.

{¶ 48} Appellant also asserts that the jury should have afforded little weight to Bennett's testimony that appellant signed the "Proby" portion of Le'Kita's name on the loan modification documents.  Appellant specifically contends that Bennett's opinion was entitled to little weight because (1) appellant's handwriting samples were obtained at the prosecutor's office pursuant to subpoena, while Le'Kita's handwriting samples were obtained at her workplace, (2) the loan modification documents to which Bennett compared the handwriting exemplars were copies and not originals, (3) the handwriting exemplars were obtained several years after the loan modification documents were executed, and (4) Bennett admitted that the nature of handwriting analysis is "opinionated" rather than an "exact science."  (Tr. Vol. I, 260.)

{¶ 49} The record does not establish how much, if any, weight the jury afforded Bennett's testimony.  At oral argument, counsel for appellant suggested that an expert's testimony "has a lot of sway" with a jury.  However, the jury was instructed that the same rules that apply to considering the credibility of general witness testimony should be applied in considering the credibility of an expert witness.  We presume the jury followed this instruction and applied the proper standard in assessing Bennett's credibility.  *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, ¶ 147.

{¶ 50} Furthermore, assuming the jury did find Bennett's testimony credible, such was its prerogative.  The jury heard Bennett's testimony, including the portions of testimony appellant now argues undermine his credibility.  During closing argument, defense counsel highlighted potential problems with Bennett's testimony, including those now advanced by appellant.  As the factfinder and sole judge of the weight of the evidence

and witness credibility, the jury was entitled to believe or disbelieve all, part, or none of Bennett's testimony. *Gullick* at ¶ 10. Although this court may consider Bennett's credibility, the jury was best able to view him and observe his demeanor, gestures, and voice inflections and use those observations in weighing his credibility. *State v. Tatum*, 10th Dist. No. 10AP-626, 2011-Ohio-907, ¶ 13.

{¶ 51} In addition, even if the jury gave no weight to Bennett's testimony, other evidence in the record supported appellant's convictions. Le'Kita testified that she did not sign the loan modification documents and did not authorize appellant or anyone else to sign those documents on her behalf. It was within the jury's province to believe Le'Kita's testimony. *Gullick* at ¶ 10. The jury also had before it several exhibits containing signatures of both appellant and Le'Kita, including the 2003 loan documents, the 2007 loan modification documents, and the 2013 handwriting exemplars. The jury simply could have compared the set of known signatures of both appellant and Le'Kita to the questioned signatures on the loan modification documents and concluded that appellant forged Le'Kita's signature on those documents.

{¶ 52} Finally, appellant contends that the presence of a notary's signature on the subordinate mortgage, by itself, creates reasonable doubt as to whether appellant forged Le'Kita's signature on that document. The jury was aware of the evidence pertaining to the notary's signature and arguably could have resolved it in the state's favor.

{¶ 53} In sum, appellant has failed to demonstrate that the jury clearly lost its way and created such a manifest miscarriage of justice that his convictions must be reversed and a new trial ordered. Because appellant's convictions were supported by sufficient evidence and were not against the manifest weight of the evidence, his second and third assignments of error are overruled.

## IV. CONCLUSION

{¶ 54} Having overruled appellant's first, second, and third assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN, P.J., and LUPER SCHUSTER, J., concur.

_____