OPINION
{¶ 1} Defendant-appellant, Eva Hairston ("appellant"), appeals from the March 31, 2005 judgment of the Franklin County Court of Common Pleas entered upon a jury verdict finding her guilty of one count of aggravated robbery, two counts of robbery and one count of theft. The jury also found her guilty of three firearm specifications pursuant to R.C. 2941.145. For the following reasons, we affirm the judgment of the trial court.
 {¶ 2} The court sentenced appellant to a four-year period of incarceration on both the offense of aggravated robbery and on one court of robbery, a three-year period of incarceration on the remaining count of robbery, and a 12-month period of incarceration on the theft offense. All of these prison terms were ordered to be served concurrently with one another but consecutive to the mandatory three-year prison term on the firearm specifications.
 {¶ 3} Appellant has timely appealed the judgment of the trial court and asserts the following single assignment of error for our review:
THE CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 4} The pertinent facts adduced at trial are as follows. Renee Green ("Green") the state's only witness, testified that on May 13, 2004, she returned home from a morning run where she found her fiancée, Kelly Thomas ("Thomas"), appellant, and appellant's brother, Terrell Chandler ("Chandler"). Green had been best friends with appellant for 17 years, the maid of honor at appellant's wedding, and was the godmother to her children.
 {¶ 5} Shortly after appellant arrived, Thomas left to go to the dentist. Green planned to take a shower and then meet Thomas at the dentist. When she entered the house to draw her bath, Green left appellant and Chandler on the porch. Upon Green's return to the porch, appellant asked to use Green's phone. Green testified that Appellant and Chandler followed her into the house and, as she was walking toward the kitchen, she heard the door being locked behind her, whereupon Chandler placed a gun to her head.
 {¶ 6} Green testified that appellant was angry with her for not providing an apartment for appellant to rent. Green stated Chandler told her to give them money and when she responded that she had none, Chandler told her to call Thomas. According to Green, appellant did not want her to call "anyone yet." It seemed to Green that appellant was in charge of the "plot" to rob her.
 {¶ 7} Green testified appellant went downstairs to the basement. Despite having a gun to her head, Green followed appellant down the stairs to turn off her bath water and found appellant coming out of her bedroom holding Green's gun. Green lunged for the gun and a struggle ensued between Green, Chandler and appellant. During the struggle, Chandler bit Green on her back, causing her to lose her grip on the gun. Appellant gained control of the weapon and she and Chandler both pointed their guns at Green. Green told the two that she was going to be sick, grabbed her cell phone off the pool table and went to the bathroom. Green testified that she had time to make a 9-1-1 call before Chandler discovered the phone and took it from her.
 {¶ 8} Appellant and Chandler took Green upstairs and into the living room at gunpoint. Appellant went outside and moved Thomas' van closer to the house. According to Green, appellant and Chandler discussed a scenario whereby they would kidnap Green, and Thomas would pay to get her back or Green would be killed. Green was forced toward the door and denied the opportunity to put on her shoes prior to leaving. Once all three were outside, appellant opened the door of the van. Green pushed Chandler toward it and ran down the street to a neighbor's home for help.
 {¶ 9} Green testified Chandler and appellant came after her in the van. She jumped over a privacy fence and saw a neighbor who let her use a phone to contact the police. Thomas' van was discovered the next day at a bank near Green's home.
 {¶ 10} Green was cross-examined regarding her verbal and written statements made to the police on the day of the incident. Green noted inconsistencies between these statements and her trial testimony. These inconsistencies included details of her escape, how appellant and Chandler gained access to her home and how Green was led from the basement to the van. Other inconsistencies noted were that Green stated in her previous statements that it was appellant who went downstairs to turn off the bath water, and that she was inside when appellant and Chandler rang the doorbell to ask to use the phone.
 {¶ 11} On cross-examination, Green also denied that a large amount of money had been in her home and that Thomas was involved in drug dealing. Green testified she saw appellant in Zanesville, Ohio, after the event and wanted to confront her. Although, Green denied looking for or threatening appellant, she did admit that had she been successful in confronting appellant in Zanesville, Ohio, she may have assaulted her. Finally, Green testified that other than the gun, no other property was taken from either her residence or the van.
 {¶ 12} Appellant's case consisted of two witnesses. Appellant called her 13-year old daughter, Sydney Chandler, to testify about an incident in Zanesville, Ohio, where Sydney observed Green, in her car, following she and her mother to Wal-Mart. After she and her mother left Wal-Mart, she again observed Green following them. She testified they were followed by Green for five-to-ten minutes.
 {¶ 13} Appellant testified on her own behalf as follows. Appellant had been living in an apartment for approximately six months and needed to be out of her apartment by May 11, 2004. She needed a new residence and believed she could rent a home from Thomas. Within days of having to move, appellant learned that the property she thought she could rent from Thomas was no longer available. She went to Green and Thomas' home on May 13, 2004, to discuss the possibility of renting another property.
 {¶ 14} Appellant testified that Green returned home from a run and Thomas left to go to the dentist. According to appellant, she and Chandler went into Green's home and sat at the kitchen table with Green. At some point, Green went downstairs to start her bath water. After Green returned upstairs, she received a telephone call from Thomas. Through this call, appellant learned that the property she had wanted to rent from Thomas had been rented to Thomas' brother. Appellant believed that she had been lied to about the availability of the rental property and became angry.
 {¶ 15} Green went downstairs to turn off her bath water. While she was on her way downstairs, appellant told her that she should put a "foot up your butt." Appellant testified Green responded, "You put your hands on me and I'll have Kelly put a hit on you." Appellant believed Thomas would put a hit on her as threatened. Appellant went to Green's bedroom to retrieve Green's gun. She admitted she was not given permission to take the gun and that in the struggle which subsequently ensued between her and Green, she struggled to maintain possession of the weapon. Ultimately, appellant gained control of the gun and she and Green continued to argue. Appellant testified that Green went to the bathroom stating that she felt sick. According to appellant, Green ran up the stairs and out her open front door.
 {¶ 16} Appellant denied ever putting the gun to Green's head. Appellant further testified that Chandler came downstairs after hearing the commotion, but that Chandler never had a gun. Appellant testified that Green went to the bathroom saying that "she was going to be sick" but denied ever seeing a cell phone with Green in the bathroom. Appellant admitted taking Thomas' van without permission. Finally, she testified that Green had followed her in Zanesville, Ohio.
 {¶ 17} On cross-examination, appellant admitted that if she had been frightened by Green's alleged statement that Thomas would place a hit on her, she could have simply left the house. Appellant further admitted to taking Green's gun without permission and maintaining possession of the gun while struggling forcefully with Green. Appellant denied ever pointing the gun at Green and to attempting a kidnapping.
 {¶ 18} In her sole assignment of error, appellant argues that her convictions must be reversed as against the manifest weight of the evidence. Appellant does not challenge the sufficiency of the evidence or assert that the state failed to produce evidence as to any element of the offenses of which she was convicted. Appellant's argument solely contests the credibility of Green's testimony, and submits that Green's version of the facts are incredible given her previous close and long-standing relationship with appellant. Appellant further argues that the facts as related by Green "do not add up."
 {¶ 19} In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a "thirteenth juror" and, after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Thompkins (1997), 78 Ohio St.3d 380, 678 N.E.2d 541. Id., quoting State v. Martin (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. Reversing a conviction as being against the manifest weight of the evidence should be reserved for only the most "exceptional case in which the evidence weighs heavily against the conviction." Thompkins, supra, at 387, quotingMartin, supra.
 {¶ 20} Appellant claims that what occurred on May 13, 2004, was merely a disagreement that could not have resulted in aggravated robbery and robbery in the manner claimed by appellant. This argument simply puts at issue the credibility of the witnesses. There were discrepancies between Green's statements made to police and her trial testimony, as well as differences between Green's testimony and that of appellant. However, the weight to be given to the evidence, and the credibility of the witnesses are issues primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212. Thus, it is within the province of the trier of fact to make determinations with respect to credibility. SeeState v. Lakes (1964), 120 Ohio App. 213, 217, 201 N.E.2d 809
("it is the province of the jury to determine where the truth probably lies from conflicting statements, not only of different witnesses but by the same witness.").
 {¶ 21} In this case, we note that while there were inconsistencies between the testimony of appellant and Green, much of their testimony was consistent in significant areas. Both agree that appellant took possession of Green's gun without permission and maintained possession of the weapon through the exertion of force. Both agree that appellant was angry. Finally, both agree that Green ran out of her own home barefoot and that appellant left the residence by taking Thomas' van without permission.
 {¶ 22} Based on the record before us, we cannot say that the evidence weighs heavily against the convictions, or that the jury clearly lost its way. Accordingly, we do not find that appellant's convictions are against the manifest weight of the evidence.
 {¶ 23} For all the foregoing reasons, appellant's sole assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
McGrath and Travis, JJ., concur.