[Cite as *State v. Gullick*, 2014-Ohio-1642.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 13AP-317 |
| | | (C.P.C. No. 12CR-1908) |
| Kevin M. Gullick, | : | |
| Defendant-Appellant. | : | (REGULAR CALENDAR) |

D E C I S I O N

Rendered on April 17, 2014

*Ron O'Brien,* Prosecuting Attorney, and *Seth L. Gilbert,* for appellee.

Yeura R. Venters, Public Defender, and *Timothy E. Pierce*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

CONNOR, J.

{¶ 1} Defendant-appellant, Kevin M. Gullick, appeals from a judgment of the Franklin County Court of Common Pleas, convicting him of murder, with a three-year firearm specification, and of having a weapon while under disability ("WUD"). For the reasons that follow, we affirm.

## A. Facts and Procedural History

{¶ 2} In the early morning hours of December 8, 2011, appellant was gambling on a game of dice with several other individuals in the front unit of a duplex on Elaine Road in Columbus, Ohio. Present were: the victim, David Burks, David Pickett, Aaron Callahan, Kevin Davis, Deonta Dean, and appellant. Sarah Springs was doing her laundry in the basement while the others were playing the game upstairs.

{¶ 3}   According to the witness, the dice game took place in the small "front room" of the unit with the players standing or sitting with their backs to the front door. Burks was sitting or standing near the front doorway. At some point during the dice game, Burks accused appellant of cheating. Shortly thereafter, a gun battle erupted in the home and spilled out onto the front lawn. When the smoke cleared, Burks had sustained a gunshot wound to his left calf and a fatal gunshot wound to his chest. Appellant sustained gunshot wounds to his leg, chest, and side. Callahan also sustained a gunshot wound.

{¶ 4}   On April 16, 2012, a Franklin County Grand Jury indicted appellant on charges of murder in violation of R.C. 2903.02, with a three-year firearm specification, and of having a weapon while under disability in violation of R.C. 2923.13. On February 25, 2013, a jury found appellant guilty of all charges in the indictment. The trial court found appellant guilty of WUD.

{¶ 5}   The trial court sentenced appellant to 15 years to life for murder, with an additional 3 years of incarceration for the firearm specification, consecutive thereto. Appellant received a concurrent sentence of 3 years for WUD. Appellant timely appealed to this court from the judgment of the Franklin County Court of Common Pleas.

### B. Assignments of Error

{¶ 6}   Appellant appeals from the trial court's decision and asserts the following assignments of error:

> First Assignment of Error:  Appellant's right to a fair trial and due process of law as memorialized in the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 16 of the Ohio Constitution were violated when the trial prosecutor insinuated that various witnesses may have been reluctant to testify because they had been threatened by Appellant or his associates.
>
> Second Assignment of Error:  Appellant's right to a fair trial and due process of law as memorialized in the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and Article I, Section 16 of the Ohio Constitution were violated when his trial counsel provided ineffective assistance of counsel.
>
> Third Assignment of Error:   Appellant's convictions are against the manifest weight of the evidence.

**C. Legal Analysis**

{¶ 7}   For purposes of clarity, we will consider the assignments of error out of order. Appellant concedes that the State presented sufficient evidence to sustain his convictions. However, in his third assignment of error, appellant challenges his conviction as being against the manifest weight of the evidence.

{¶ 8}   "The weight of the evidence concerns the inclination of the greater amount of credible evidence offered in a trial to support one side of the issue rather than the other." *State v. Brindley*, 10th Dist. No. 01AP-926, 2002-Ohio-2425, ¶ 16, citing *State v. Gray*, 10th Dist. No. 99AP-666 (Mar. 28, 2000); *see also State v. Chandler*, 10th Dist. No. 05AP-415, 2006-Ohio-2070, ¶ 8.  The weight to be given to the evidence, as well as the credibility of the witnesses, are issues which are primarily to be determined by the trier of fact.  *State v. Hairston*, 10th Dist. No. 05AP-366, 2006-Ohio-1644, ¶ 20, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967).

{¶ 9}   A defendant is not entitled to a reversal on manifest weight grounds simply because there was inconsistent evidence presented at trial.  *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21; *State v. Stewart*, 10th Dist. No. 08AP-33, 2009-Ohio-1547, ¶ 17.  The trier of fact is in the best position to take into account any inconsistencies, along with the witnesses' demeanor and manner of testifying, and determine whether or not the witnesses' testimony is credible.  *Chandler* at ¶ 9, citing *State v. Williams*, 10th Dist. No. 02AP-35, 2002-Ohio-4503, ¶ 58. *Stewart* at ¶ 17.

{¶ 10}   "While the jury may take note of the inconsistencies and resolve or discount them accordingly, see *DeHass*, supra, such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Nivens*, 10th Dist. No. 95APA09-1236, (May 28, 1996).  A jury, as the finder of fact and the sole judge of the weight of the evidence and the credibility of the witnesses, may believe or disbelieve all, part, or none of a witness's testimony.  *State v. Antill*, 176 Ohio St. 61, 67 (1964); *State v. Jackson*, 10th Dist. No. 01AP-973 (Mar. 19, 2002); *Chandler* at ¶ 13; *Raver* at ¶ 21.

{¶ 11}  A conviction is not against the manifest weight of the evidence merely because the jury believed the prosecution testimony.  *State v. Houston*, 10th Dist. No. 04AP-875, 2005-Ohio-4249, ¶ 38 (reversed and remanded in part on other grounds); *Stewart* at ¶22.   An appellate court must give great deference to the fact finder's

determination of the witness credibility. *Chandler* at ¶19; *State v. Webb*, 10th Dist. No. 10AP-189, 2010-Ohio-5208, ¶ 16.

{¶ 12} Deonta Dean testified for the prosecution under a partial grant of immunity. According to Dean, a friend invited him to the Elaine Road residence on December 8, 2011, "to hang out." (Tr. Vol. II-A, 159.) Dean testified that he was a close friend of the victim, David Burks, who went by the nickname "Stuff." (Tr. Vol. II-A, 161.) When Dean arrived at the home, he saw several individuals shooting dice including Burks and appellant. Dean was acquainted with appellant because they had lived in the same neighborhood for the past four or five years.

{¶ 13} Appellant and Burks got into an argument during the dice game and appellant accused Burks of cheating. After the argument, appellant left the front room and went into the kitchen while Burks took his seat. According to Dean, appellant returned to the front room carrying a handgun, walked over to Burks, and shot him as he sat in the chair. Appellant shot Burks again as appellant fled out the front door. After appellant fired the second shot at Burks, a chaotic gun battle erupted inside the apartment. As Dean ran from the room, he observed appellant firing his weapon into the home from just outside the front door.

{¶ 14} Sarah Springs testified that she had been living with appellant in the vacant front section of the duplex in the weeks prior to the shooting. She stated that she did not get along with Burks. According to Springs, she was doing her laundry in the basement and getting high on drugs when she heard three shots ring out. She ran upstairs to check on appellant and, "out of the corner of [her] eye," she saw appellant shoot at someone lying on the ground. (Tr. Vol. II, 214.)

{¶ 15} The trial court called 17-year-old David Picket as its own witness. Picket had initially told both the police and the prosecutor that he had seen appellant shoot Burks but he later retracted those statements. In fact, in an interview conducted by the prosecutor while Picket was in the custody of the Department of Youth Services, Picket told the prosecutor that he did not see who shot Burks and that his prior statements were lies. At trial, Picket testified that he was a friend of the victim, David Burks, and that Burks went by the nickname of "OG." Although Picket denied seeing appellant shoot Burks, he admitted that he told the police and the prosecutor that he had seen appellant

shoot Burks.   Picket acknowledged that the State had given him partial immunity in exchange for his testimony.

{¶ 16}  The physical evidence recovered from the scene consisted of two handguns, eleven spent shell casings, and five spent projectiles. Specifically, police recovered two operable .380 caliber handguns: a Bryco-Jennings model with an eight round magazine containing five live rounds; and a fully loaded Cobra model with a six shot capacity. Police found two .380 caliber shell casings near the driveway and one inside the home. None of the casings recovered at the scene matched the type found in the fully-loaded Cobra.[1]

{¶ 17}  Mark Hardy is an expert in firearm identification with the Columbus Police Crime Lab ("CPCL"). Hardy opined that two of the three .380 shell casings found at the scene had been fired from the Bryco-Jennings model. Hardy was not certain of the origin of the third shell casing found inside the home.

{¶ 18}  Dr. Raman Tejwani, a forensic scientist with the CPCL, testified that he found appellant's DNA on the handle of the Bryco-Jennings model. According to Dr. Tejwani, Burks' DNA was not found on the Bryco-Jennings model, but that Burks could not be excluded as a contributor of the DNA found on the Cobra model.

{¶ 19}  Dr. Mathew Congleton, a forensic scientist with the Bureau of Criminal Investigation, testified that test swabs of appellant's hands tested positive for the presence of gun shot residue ("GSR"), as did the swabs taken from each of the individuals who were in the front room when the shooting started. Dr. Congleton explained that it is possible to find GSR on any person who is near a firearm as it is discharged, even if the person did not fire the weapon.

{¶ 20}  Appellant first contends that the testimony of the State's fact witnesses, Dean, Springs, and Picket, is unworthy of belief inasmuch as these witnesses provided contradictory accounts of the incident and because their own accounts were inconsistent with prior statements they gave to police.  With regard to Dean, appellant points out that he failed to inform police that he saw appellant shoot Burks when police interviewed him at the scene; that he admitted to being "close friends" with the victim; that he had been

---

[1]Police also recovered two 9mm shell casings and two .45 caliber shell casings outside the residence, and two .45 caliber shell casings and two 9mm shell casings inside the residence.  They did not find a .45 caliber handgun or a 9mm handgun at the scene.

convicted of several felonies; and that he was testifying under a grant of partial immunity. Appellant notes that Springs initially denied seeing any drug activity at the home and gave police a false name at the scene. Picket also gave police a false name at the scene.

{¶ 21} We agree that there are credibility issues regarding each of the fact witnesses who testified in this matter. Each of these witnesses lied to police about some aspect of their story. Our review of the witness testimony reveals that the witnesses lied to police in order to conceal their own involvement in the illegal gambling and drug activities that took place at the scene or to avoid getting further involved in the case. However, the fact that a witness may have lied to police does not mean that the jury was required to disbelieve their testimony. *See, e.g.*, *State v. Walker,* 8th Dist. No. 97648, 2012-Ohio-4274, ¶ 44 (It is well within its purview of the jury to believe the prosecution's witnesses over defendant even though "they all initially lied to police and some of them changed their stories more than once."); *State v. Cameron*, 10th Dist. No. 10AP-240, 2010-Ohio-6042, ¶ 40 (Jury was not required to disregard witness' testimony even though the witness had admitted that he lied to police and that he was "willing to lie even if it got another person in trouble.").

{¶ 22} While appellant argues that Dean was an acknowledged friend of the victim and that he had an interest in seeing Burks' killer brought to justice there is no claim that Dean held a prior grudge against appellant or that he had some reason to falsely accuse appellant of Burks' murder. On the other hand, the jury was aware that Springs was a friend of appellant and that she did not get along with the victim. Unlike Dean and Picket, Springs did not receive immunity in return for her testimony. Nevertheless, her testimony corroborated Dean's claim that appellant shot at Burks as he lay on the floor. Although Springs expressed reservations about her ability to see and recollect the incident, the jury was entitled to give considerable weight to her testimony both in determining appellant's guilt and in assessing the reliability of Dean's account of the incident.

{¶ 23} The trial court called Picket as its own witness. As a result, Picket was the one fact witness subject to cross-examination by both the prosecutor and counsel for the accused. The jury had an opportunity to observe his demeanor on the stand and the manner of his testimony, and the jury was in the best position to determine whether his testimony was believable. *DeHass; Antill; Jackson.*

{¶ 24} Picket admitted that he was one of the individuals in the room when the shooting started. Thus, it is much more likely that Picket saw the shooter than not. Moreover, Picket's initial statements to police and his statement to the prosecutor are consistent with Dean's trial testimony. Under the circumstances, the jury was entitled to believe the statements Picket admittedly gave to police and the prosecutor rather than the story he told at trial. Moreover, even if the jury were to believe that Picket saw nothing, the jury was still free to believe the testimony of Dean and Springs.

{¶ 25} Appellant next contends that the lack of supporting forensic evidence raises doubt about the State's case against appellant. For example, appellant correctly notes that the State's forensic experts were unable to determine that the spent .380 caliber projectiles recovered at the scene had been fired from the Bryco-Jennings handgun. However, as noted above, Dr. Tejwani found appellant's DNA on the handle of the .380 caliber Bryco-Jennings handgun, and Hardy opined that the weapon had fired at least two projectiles during the incident. While the forensic evidence presented by the State was hardly conclusive of appellant's guilt, such evidence was clearly consistent with appellant's guilt.

{¶ 26} A conviction is not against the manifest weight of the evidence merely because the jury chose to believe the prosecution testimony. *Houston.* In this case, the State's forensic evidence combined with the testimony of the State's fact witnesses provides a sufficient quantity of believable evidence to support appellant's conviction beyond a reasonable doubt. *Brindley; Gray*. Sitting as a thirteenth juror, we cannot say that this jury lost its way in assessing the weight and credibility of the evidence and finding appellant guilty of the offenses for which he was convicted. *Cameron* at ¶ 35, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). The same is true of the conviction for WUD handed down by the trial court.

{¶ 27} For the foregoing reasons, we hold that the verdict was not against the manifest weight of the evidence. Appellant's third assignment of error is overruled.

{¶ 28} In his first assignment of error, appellant argues that misconduct on the part of the prosecutor deprived him of a fair trial. Specifically, appellant claims that the prosecutor implied, during his examination of Dean, Springs, and Picket, that each witness had been threatened with violence by appellant or an associate of appellant if they

testified against him. Appellant believes that the prosecutor's examination unfairly prejudiced his defense by implicating him in other uncharged crimes, wrongs or acts. *See* Evid.R. 404(B).

{¶ 29} "The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights. * * * The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, ¶ 145, *certiorari denied*, 540 U.S. 955, (2003). The accused's failure to object to the alleged misconduct of the prosecutor at trial waives all but plain error on appeal. *State v. Perry,* 10th Dist. No. 01AP-996, 2004-Ohio-5152, ¶ 73.

{¶ 30} With regard to both Dean and Springs, the transcript reveals that the prosecutor merely asked each of them if they wanted to be in the courtroom to give testimony in the case. Springs responded that she "didn't want to be put in the middle of being involved." (Tr. Vol. II-A, 201.) Dean simply stated that he did not want to testify. (Tr. Vol. II-A, 154.) The prosecutor did not ask either witness if they were afraid to testify or if they had been threatened by anyone. Thus, the record does not provide any support for appellant's theory of misconduct with regard to the prosecutor's examination of Springs or Dean.

{¶ 31} With respect to Picket, the trial court informed the jury that he was being called as the court's witness and that the prosecutor would be permitted to attack his credibility. Appellant takes exception to the prosecutor's conduct, as evidenced by the following colloquy:

> [Prosecutor]: And you don't want to be on the stand, do you?
> You don't want to testify, do you?
>
> [Picket]: No.
>
> Q. You don't? Are you afraid to testify? Are you afraid that
> something would happen to you if you testified?
>
> A. No.
>
> Q. Okay. Well, do you remember, when I spoke to you at DYS,
> you said, I don't want my mother to wake up without a son
> over this. You said that, didn't you?

A. I might have.

Q. You said you didn't want to be involved in this because you were afraid for your safety, correct?

A. Yeah.

Q. DO you have a problem with people testifying in general?

A. Huh?

Q. Do you have a problem with people coming in and testifying to the jury about what happened?

A. No.

Q. You think they're snitches.

A. No.

Mr. Yohey:  Just a moment, Your Honor.

Q. David, you came to court yesterday on my subpoena, correct?  You have to answer verbally.

A. Yes.

Q. All right.   And you left without being able to testify yesterday, correct.

A. Yes.

Q. I told you to come back today.   After you left court yesterday, didn't you post a statement on your Facebook page, quoting a lyric saying, I seen young niggers cry.  I seen young niggers sold.  I seen young niggers die, because young niggers told?

A. That's the song.

Q. Yes, it is.  And you posted it on your Facebook page after you came to court yesterday, right?

A. They are lyrics to a song.  Why wouldn't I post it?

Q. Why would you post it?

A. Because it's lyrics to a song that everybody listens too.

Q. Lyrics to a song about doing exactly what we're doing here today.

A. It's a coincidence.

Q. Heck of a coincidence, David.

(Tr. Vol. II-A, 251-52.)

{¶ 32} When the prosecutor asked Picket whether he was afraid that something would happen to him if he testified, Picket responded "No." To the extent that the prosecutor needed a good-faith basis to inquire whether Picket was afraid to testify, the Facebook posting combined with Picket's changing story certainly provided such a basis. Moreover, while the prosecutor's examination was clearly intended to leave the jury with the impression that Picket's trial testimony was impacted by his fear of being branded a snitch, there is no implication that appellant or appellant's associates threatened Picket. The prosecutor did not reference any alleged threats by appellant during his closing argument.

{¶ 33} In short, the record does not support appellant's claim of prosecutorial misconduct. Appellant's first assignment of error is overruled.

{¶ 34} In appellant's second assignment of error, appellant claims that his trial counsel provided him with ineffective representation by failing to object to the misconduct of the prosecutor as set forth in his first assignment of error. Having determined that the record does not reveal any misconduct on the part of the prosecutor, appellant's claim of ineffective assistance of trial counsel is without merit. Accordingly, appellant's second assignment of error is overruled.

{¶ 35} Having overruled each of appellant's assignments of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

KLATT and T. BRYANT, JJ., concur.

T. BRYANT, J., retired, of the Third Appellate District, assigned to active duty under authority of Article IV, Section 6(C), Ohio Constitution.

_____