[Cite as *State v. Walker*, 2025-Ohio-1070.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

      Plaintiff-Appellee,              :               No. 24AP-329
                                         (C.P.C. No. 22CR-2438)

v.                                                :

Demetrious D. Walker,                             :               (REGULAR CALENDAR)

      Defendant-Appellant.             :

---

D E C I S I O N

Rendered on March 27, 2025

---

**On brief:** [*Shayla D. Favor*], Prosecuting Attorney, *Kimberly Bond*, and *Paige A. Lane*, for appellee. **Argued:** *Paige A. Lane.*

**On brief:** *Todd W. Barstow*, for appellant. **Argued:** *Todd W. Barstow.*

---

APPEAL from the Franklin County Court of Common Pleas

JAMISON, P.J.

{¶ 1} Defendant-appellant, Demetrious D. Walker, appeals from a conviction by bench trial in the Franklin County Court of Common Pleas. For the following reasons, we affirm the judgment of the trial court.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} At trial, S.A. testified extensively about her encounter with Walker on May 24, 2022. At approximately 4:30 p.m., S.A. was finishing up her workday at Pri-Value Insurance ("Pri-Value") located on West Broad Street, Franklin County, Ohio. She heard a knock at the business's back door, and she answered it. Standing there was a man she did not recognize. He had dark skin and was wearing a black sweatshirt and jeans. The man inquired about purchasing automobile insurance. S.A. informed him that Pri-Value was

about to close for the day, and he would have to come back another time.  The man asked for a business card.  S.A. went back to the office to retrieve one for him.  When she did so, he followed her into the office uninvited.

{¶ 3}    S.A. handed the man a business card, but he told her, "I don't need that card. I need your personal number.  I don't need the card for the office number." (Mar. 19, 2024 Tr. Vol. I at 67.) S.A. responded, "No, I don't want to give you my personal phone number. That's inappropriate.  We should keep this . . . professional." *Id.*  The man insisted that he needed her number, but she continued to reject his advances.

{¶ 4}    The man pulled out a knife.  S.A. grabbed a canister of pepper spray and tried to use it on him.  However, she could not figure out how it worked.  The man pushed her up against the desk with her back against the computer.  He kissed her on the lips.  He held the knife close to her and the two began to struggle.  S.A. was pushing his arm away, but he continued to get closer to her as if he was going to stab her.  He dropped her to the floor, and they continued to struggle.  He attempted to pull her pants down and S.A. attempted to push him away.  The man told her, "If you keep struggling like this, I will have to stab you." *Id.* at 68.  He pushed her down again and pulled her pants down.  The man also pulled his pants down and was holding the knife close to her neck.  The two continued to struggle. S.A. attempted to stand up, but the man pushed her to the floor again.  He sat her on her knees and told her, "If you don't do what I want right now, I'm going to cut your throat." *Id.* at 69.  S.A. tried pushing him away again and closed her mouth, but the man forced her to put his penis in her mouth for a second.

{¶ 5}    S.A. continued to resist, so the man pushed her down so that her hands were on the floor.  With her pants already down, the man attempted to insert his penis into S.A.'s "butt." *Id.* at 71.  The man was not wearing a condom.  S.A. struggled and tried moving away from the man and he was not able to penetrate her with his penis.  The man stood her up and attempted to stab her.  As S.A. was still struggling with him, she looked down at her right hand and it was dripping blood.  She never felt the knife cut her hand, so she was not exactly sure when it happened.  S.A. indicated that it occurred after he attempted to penetrate her anally.

{¶ 6}    When the man noticed her hand was bleeding, he panicked.  S.A. said to him, "No, no, please, I'm bleeding, can you get me any help?" *Id.* at 72.  He retrieved some tissues

and covered her hand with them.  He asked her where the bathroom was and she told him, but then he tried to push and stab her again.  S.A. told him, "No, no, no, I have a heart condition, please, I don't feel good, I think I'm going to pass out, please stop." *Id.* at 72.  He sat her on the floor, and he sat in front of her.  The man told her, "I thought you were one of the racist people." *Id.* at 73.  S.A. responded, "No, I am not racist.  Just because I didn't give you my personal phone number doesn't mean that I am one." *Id.*  He replied, "Oh, it's because I was hurt a lot by the white people.  My family struggled a lot here.  I struggled a lot." *Id.*  To get him to leave, S.A. showed him a scar on her hand and said, "Look, that's what the Americans did to me." *Id.*  She eventually asked him to leave, but he refused.  S.A. then said, "I feel sorry for you, and if you don't want to get caught you have to leave right now.  I promise I won't tell anyone, I won't tell the police, just please leave." *Id.* at 73-74.

{¶ 7}  The man again asked where the bathroom was, and S.A. told him.  He began looking at the knife as if he wanted to go wash it off, but he did not.  He then agreed to leave and walked to the front door.  Before leaving, he made S.A. promise not to tell anyone and then said, "Okay. But I better find you here tomorrow.  Because . . . if I don't find you at work here tomorrow to finish what we just started, then I'm gonna kill a lot of people." *Id.* at 74.  The man exited the front door and S.A. returned to the office.  She texted her friend to call 9-1-1.  She called her father, but he did not answer.  S.A. called her mother.  Her mother told her to go next door to a cell phone store.  She said a family friend worked there that would help her.  S.A. went to the cell phone store, but it was only the family friend's brother there.  He did not help her, so she returned to Pri-Value.  She sat in a chair in the office and waited for her father.

{¶ 8}  Meanwhile, shortly before 5:00 p.m., S.A.'s father, M.A., was leaving to go pick her up from Pri-Value. *Id.* at 47.  Before he could leave, his wife received a phone call and alerted him that something was wrong with S.A.  He got in the car and drove to Pri-Value. M.A. arrived at the office approximately four to five minutes after S.A. returned from the cell phone store.  When M.A. arrived, S.A. was seated in a chair in the middle of the office.  He observed blood under the chair, on her clothes, on her shoes, and on her face.  It looked like she had been in a fight.  S.A.'s hand was covered in tissues and bleeding.  M.A. called 9-1-1.  Shortly thereafter, the police arrived and asked S.A. a few questions.  Then she was transported to the hospital.

{¶ 9}    At the hospital, it was discovered that S.A. had multiple lacerations between her thumb and index finger. The lacerations required stitches. At the time of the trial in this matter, these injuries were still impacting S.A.'s life. *Id.* at 108. She had scarring, was unable to lift anything heavy with her right hand, had pain from time to time, and her finger had a loss of sensation.

{¶ 10} S.A. was examined by Sarah Randolph, a sexual assault nurse examiner ("SANE"). (Tr. Vol. II at 18.) Randolph performed a head-to-toe assessment of S.A.'s body and prepared a report regarding the examination. She noted several injuries. First, S.A. had a laceration near her right thumb. Second, there was an injury to the posterior fourchette of S.A.'s vaginal opening. Lastly, Randolph noted bruising on her internal labia. Randolph swabbed the following areas of S.A.'s body: around her mouth where the man's penis touched her face; her right hip where the man touched her to pull down her pants; her "right and left butt cheeks"; a scratch on her left wrist and hand; her perianal area; her internal labia; and underneath her fingernails. (*Id.* at 83; State's Ex. I-2 at 17.) She also took a cheek swab for S.A.'s DNA standard and collected her clothing.

{¶ 11} The Franklin Township Police Department ("FTPD") and the Franklin County Sheriff's Office ("FCSO") investigated this incident. Sergeant David Pollack from FTPD responded to a call for service for an alleged sexual assault on West Broad Street, Franklin County, Ohio. (Tr. Vol. I at 34-35.) When he arrived, he was approached by M.A. M.A. told Sergeant Pollack that his daughter was attacked and was inside of the business. Sergeant Pollack encountered S.A. inside the building. She had an extensive cut on her hand that was bleeding profusely. Sergeant Pollack called for medics and S.A. provided a description of the suspect. *Id.* at 39. Shortly thereafter, FCSO responded to the scene and took over the investigation. *Id.* at 41. Sergeant Pollack began canvassing the area for witnesses and the suspect.

{¶ 12} Detectives Benjamin Cochran and Aaron Kawasaki of the FCSO responded to Pri-Value after Sergeant Pollack. Once on the scene, the detectives took photographs and obtained security video footage from inside of the business. The video was broken into 5 separate segments with gaps in between. (State's Exs. C1-C5.) Each segment lasted approximately 12 to 15 seconds. The gaps between the videos were due to the camera being motion activated. (Tr. Vol. I at 189.) From these videos the detectives were able to obtain

an image of the suspect.  The suspect was wearing distinctive clothing.  He was wearing black shoes, a long-sleeved black shirt with a light gray design on it, and faded jeans with holes in the front.  *Id*. at 168.

{¶ 13} After obtaining an image of the suspect, the detectives began canvassing the area.  Detective Cochran went to a wooded area behind a nearby Speedway where homeless individuals were known to frequent.  He spoke to an adult male who he recognized from working in the jail.  Detective Cochran provided the man with a description of the suspect and the man indicated that he knew who Detective Cochran was talking about.  The man stated that the suspect was new to the area as a homeless person and slept behind the Westland Mall.  (Tr. Vol. I at 145.)  He indicated that the suspect frequently wore a red sweatshirt.  Patrol officers searched behind the Westland Mall but did not locate the suspect.

{¶ 14} Detectives spoke with the cashier at a BP station across the street from Pri-Value.  That individual believed that the suspect was a regular who had been in earlier that day to get change for beer.  The detectives recalled that the previous night, a man was arrested for exposing himself in the area and that individual matched the physical description of the suspect.  They showed a picture of that individual to the BP cashier, but the cashier said it was not the same person.

{¶ 15} As Detective Kawasaki was about to go off duty, he observed a male matching the physical description of the suspect and wearing the same type of clothing.  *Id*. at 171.  The man was crossing West Broad Street from the incident location toward the BP.  He was wearing black shoes and jeans with tears in the front.  Detective Kawasaki notified Detective Cochran, and the detectives made contact with the man.  The man was identified as Walker.  Walker was wearing a red sweatshirt, but underneath was the same black shirt the suspect in the security video was wearing.  He was also wearing the same pants with tears in them.  The detectives observed what appeared to be dried blood stains on Walker's pants and shirt.  The detectives took photos and collected Walker's clothing.  *Id*. at 149, 172.  FCSO received the initial 9-1-1 call regarding the incident at 5:12 p.m. and arrested Walker in the area around 10:00 p.m. the same day.

{¶ 16} Following Walker's arrest, Detective Cochran returned to the office and created a photo lineup that was to be given to S.A.  When S.A. was shown the lineup, she

identified the picture of Walker as the man who assaulted her. *Id*. at 105, 152. Detective Cochran also took a DNA sample from Walker.

{¶ 17} The following items were submitted to the Ohio Bureau of Criminal Investigation ("BCI") for DNA analysis: S.A.'s SANE examination kit; the clothes Walker was wearing at the time of his arrest; and Walker's DNA sample taken by Detective Cochran. Nicole Augsback, a forensic scientist at BCI, performed DNA analysis on the evidence in this case and prepared a report regarding her findings. (Tr. Vol. II at 49.) Her analysis of the DNA swabs from outside of S.A.'s mouth revealed a mixture of DNA profiles that were "consistent with contributions from" both S.A. and Walker. *Id*. at 70. At trial, Augsback testified that "[t]he estimated frequency of occurrence of [the] DNA profile that was not attributable to [S.A.] is lower than one in one trillion unrelated individuals." *Id*. at 70-71. Augsback explained this means she would have to analyze the DNA of more than one trillion individuals before she would expect to find another matching profile unless there was an identical sibling. *Id*. at 71. Swabs from two stains on Walker's shirt were presumptive positive for blood. Both stains contained a DNA profile consistent with S.A.'s and the estimated occurrence was one in one trillion. *Id*. at 74-75.

{¶ 18} Logan Schepeler, a forensic scientist at BCI, performed YSTR DNA analysis on a swab from S.A.'s internal labia and a swab from the interior of the front crotch panel of S.A.'s underwear. *Id*. at 105, 109, 111. YSTR is a male-specific DNA testing. It is not unique to an individual. It is based on the Y chromosome that is passed down amongst males in a paternal line. On both items of evidence, Schepeler's analysis revealed a YSTR DNA profile consistent with Walker's profile. Schepeler would not expect to find that profile more frequently than 1 in 9,750 males in the United States. *Id*. at 109-11.

{¶ 19} On June 2, 2022, Walker was indicted by a Franklin County Grand Jury on the following charges: Count 1, kidnapping, a violation of R.C. 2905.01, a felony of the first degree; Count 2, rape, a violation of R.C. 2907.02, a felony of the first degree; Count 3, attempted rape, a violation of R.C. 2923.02 and 2907.02, a felony of the second degree; and Count 4, felonious assault, a violation of R.C. 2903.11, a felony of the second degree. Walker pled not guilty to the charges. A motion regarding competency was filed and Walker was found competent to stand trial.

{¶ 20} On March 19, 2024, Walker waived his right to a jury trial and elected to be tried by a judge of the trial court. The matter proceeded to a bench trial and Walker was subsequently found guilty on all charges in the indictment. The trial court sentenced Walker to a minimum of 14 years with a potential maximum term of 19 years in prison. Walker was also ordered to register as a Tier III Sex Offender. It is from this judgment that Walker now brings this appeal.

## II. ASSIGNMENT OF ERROR

{¶ 21} Appellant assigns the following as trial court error:

THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF KIDNAPPING; RAPE; ATTEMPTED RAPE; AND FELONIOUS ASSAULT, AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## III. STANDARD OF REVIEW

{¶ 22} A sufficiency of the evidence challenge examines "whether the evidence is legally adequate to support a verdict." *State v. Kurtz*, 2018-Ohio-3942, ¶ 15 (10th Dist.). The test for sufficiency is whether the prosecution has met its burden of production at trial, and is a question of law, not fact. *State v. Boles*, 2013-Ohio-5202, ¶ 34 (12th Dist.). An appellate court's standard of review for sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Rankin*, 2011-Ohio-5131, ¶ 12 (10th Dist.), citing *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds as stated in*, *State v. Smith*, 80 Ohio St.3d 89, 102, fn. 4 (1997). The testimony of one witness, if believed by the trier of fact, is enough to support a conviction. *State v. Strong*, 2011-Ohio-1024, ¶ 42 (10th Dist.).

{¶ 23} While sufficiency of the evidence tests whether the evidence is legally sufficient to support the conviction, the manifest weight of the evidence standard "addresses the evidence's effect of inducing belief." *State v. Haas*, 2011-Ohio-2676, ¶ 16

(10th Dist.). A challenge to the weight of the evidence questions whether a greater amount of credible evidence was admitted supporting the conviction rather than acquittal. *State v. Wilson*, 2007-Ohio-2202, ¶ 25. When weighing the evidence, the court of appeals must consider whether the evidence in a case is conflicting or where reasonable minds might differ as to the inferences to be drawn from it, consider the weight of the evidence, and consider the credibility of the witnesses to determine if " 'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Williams*, 2011-Ohio-4760, ¶ 20 (10th Dist.), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A reviewing court generally must defer to the trier of fact's determination of witness credibility because it is " 'best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *State v. Cattledge*, 2010-Ohio-4953, ¶ 6 (10th Dist.), quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *State v. Blankenburg*, 2012-Ohio-1289, ¶ 114 (12th Dist.).

## IV. LEGAL ANALYSIS

{¶ 24} In his sole assignment of error, Walker contends that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. In Count 1, Walker was convicted of kidnapping, a violation of R.C. 2905.01. That section states the following:

> No person, by force, threat, or deception . . . shall remove another from the place where the other person is found or restrain the liberty of the other person for any of the following purposes:
>
> . . .
>
> (2) To facilitate the commission of any felony or flight thereafter;
>
> (3) To terrorize, or to inflict serious physical harm on the victim or another;
>
> (4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will[.]

R.C. 2905.01(A)(2) through (4). The element of restraining the liberty of another "does not depend on the manner in which an individual is restrained." *State v. Wilson*, 2000 Ohio App. LEXIS 5057, *13 (10th Dist. Nov. 2, 2000). The question is "whether the restraint is such as to place the victim in the offender's power and beyond immediate help, even though temporarily." (Internal quotation marks deleted and citation omitted.) *Id.* Actual confinement need not be proven. *Id.* Merely compelling the victim to stay in the same location is sufficient. *Id.* "Sexual activity" is defined as "sexual conduct or sexual contact, or both." R.C. 2907.01(C). "Sexual contact" is defined as the "touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶ 25} Walker was convicted in Count 2 of rape, a violation of R.C. 2907.02(A)(2), and in Count 3 of attempted rape, a violation of R.C. 2923.02 and 2907.02. R.C. 2907.02(A)(2) states that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2923.02(A) states that "[n]o person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." "Sexual Conduct" is defined in R.C. 2907.01(A) as:

> [V]aginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

A person acts with purpose "when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). "Force" is defined in R.C. 2901.01(A)(1) as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing."

{¶ 26} S.A. testified that on May 24, 2022, at approximately 4:30 p.m., she was working at Pri-Value located on West Broad Street, Franklin County, Ohio. Walker knocked on the back door and inquired about insurance. S.A. told him the business was about to close and he would have to come back another day. When she went inside to get a business card, Walker followed her and asked for her personal phone number. When she refused to give him her phone number, Walker pulled out a knife and pushed her up against the desk. S.A. tried to push Walker away, but he dropped her to the floor. Walker told her, "If you keep struggling like this, I will have to stab you." (Tr. Vol. I at 68.) As they were struggling, Walker took down his pants and tried to pull down S.A.'s. He held the knife close to her neck and told her, "If you don't do what I want right now, I'm going to cut your throat." *Id.* at 69. Walker then sat S.A. up on her knees and forced S.A. to put his penis in her mouth for a second.

{¶ 27} S.A. continued to resist, so Walker pushed her down and tried to rape her from behind. At different points in her testimony, S.A. stated that he tried to penetrate her vaginally and did not try to penetrate her vaginally. S.A. testified that he attempted to put his penis in her butt, but he was unsuccessful. DNA profiles consistent with Walker's were found on the area around S.A.'s mouth, on swabbings from S.A.'s internal labia, and on the interior crotch panel of S.A.'s underwear. DNA profiles consistent with S.A.'s were found on blood stains on the clothing Walker was wearing when he was arrested. The clothing Walker was wearing at the time of his arrest was the same as the clothing worn by the suspect in Pri-Value's security video.

{¶ 28} Viewing the evidence and all reasonable inferences in favor of the prosecution, Walker's convictions for kidnapping, rape, and attempted rape were supported by sufficient evidence. S.A.'s testimony clearly establishes each element of Walker's convictions in Counts 1, 2, and 3. S.A. was restrained of her liberty by force and threat. Walker held her at knifepoint throughout the assault. He physically manipulated her into different positions in order to facilitate the rape and attempted rape. He told S.A. he would stab her if she did not stop struggling. He threatened that if S.A. did not do what he wanted, he would cut her throat. These demands and threats establish that Walker acted with purpose in restraining S.A. of her liberty and sexually assaulting her.

{¶ 29} Although he was unable to penetrate her vaginally or anally with his penis, he did make S.A. insert his penis into her mouth at knifepoint. S.A. testified that it only happened for a second, but "oral stimulation, however slight, is sufficient to complete fellatio within the meaning of R.C. 2907.01(A)." *State v. Phillips*, 1993 Ohio App. LEXIS 5002, *5 (8th Dist. Oct. 14, 1993). In fact, penetration is not required to prove fellatio rape. *State v. Boyer*, 2006-Ohio-6992, ¶ 25 (10th Dist.). Mere contact between a defendant's penis and the victim's mouth is sufficient. *Id.*

{¶ 30} Any discrepancies in S.A.'s testimony regarding whether Walker was attempting to rape her anally or vaginally are immaterial. Walker was attempting to rape her from behind and S.A. was continuously struggling to get away from him. It is completely understandable that S.A. would be confused about Walker's intentions. Moreover, the state's allegation that Walker attempted to rape S.A. vaginally was supported by the physical evidence. The YSTR DNA profile developed from the swabbing of S.A.'s internal labia was consistent with Walker's profile. (Tr. Vol. II at 109.) During S.A.'s SANE examination, Randolph noted injuries to S.A.'s vaginal area. *Id.* at 23-24.

{¶ 31} Although S.A. was unable to identify Walker at trial, the evidence clearly establishes Walker as S.A.'s assailant. S.A. picked him out of a lineup on the night of the incident. DNA consistent with Walker's profile was found on S.A.'s body. Notably, the frequency of occurrence of the DNA profile consistent with Walker's on the outside of S.A.'s mouth was one in one trillion unrelated individuals. DNA consistent with S.A.'s profile was found in blood stains on Walker's clothing. At the time of his arrest, Walker was wearing the same clothing as the suspect in the security camera footage.

{¶ 32} Walker was convicted in Count 4 of felonious assault, a violation of R.C. 2903.11. That section states that, "[n]o person shall knowingly do either of the following: (1) [c]ause serious physical harm to another or to another's unborn; (2) [c]ause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(1) and (2). A person acts "knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). "Serious physical harm to persons" is defined, in part, in R.C. 2901.01(A)(5)(c) as "[a]ny

physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity." "Deadly weapon" is defined in R.C. 2923.11(A) as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon."

{¶ 33} S.A. testified that Walker possessed a knife during the assault. Walker threatened to stab her and cut her throat if she did not comply with his demands. S.A. testified that Walker attempted to stab her with the knife multiple times. At some point during the assault, S.A. noticed that her hand was bleeding. She was not sure how it happened because she never felt the knife cut her hand. When Sergeant Pollack arrived on scene, he observed that S.A. had an extensive laceration on her hand that was bleeding profusely. At the hospital, it was discovered that S.A. had multiple lacerations on her hand that required stitches. S.A. testified at trial that nearly two years later, she was still having complications with her hand from the injury.

{¶ 34} Again, viewing the evidence and all reasonable inferences in favor of the prosecution, Walker's conviction for felonious assault was supported by sufficient evidence. At some point during the assault, S.A.'s hand sustained multiple lacerations from the knife. At trial, Walker argued that the lacerations were not intentionally caused. However, the mens rea for felonious assault is knowingly. R.C. 2903.11. When an individual, armed with a knife, engages in a struggle with another person, that individual is aware that their behavior will probably cause injuries to the other person. Thus, although the injuries to S.A. may not have been caused intentionally, the evidence is sufficient to establish that Walker acted knowingly. S.A.'s testimony also established that she suffered serious physical harm. S.A. testified that she still gets pain in her hand, she has physical scars, she lacks full feeling in her finger, and she is unable to lift anything heavy with that hand. (Tr. Vol. I at 108). This establishes permanent partial incapacity of her hand. *See State v. Berecz*, 2010-Ohio-285, ¶ 54 (4th Dist.) (finding that astigmatism caused by an assault was serious physical harm based on some permanent partial incapacity to the victim's eye).

{¶ 35} Even if we were to find that there was insufficient evidence to support the allegation that Walker knowingly caused serious physical harm to S.A., there is sufficient evidence to support a felonious assault conviction for knowingly causing or attempting to cause physical harm to S.A. by means of a deadly weapon. S.A. testified that Walker tried

to stab her on multiple occasions during the assault. This testimony is sufficient to establish that Walker attempted to cause physical harm to S.A. with the knife.

{¶ 36} Despite no testimony describing the knife and the knife not being introduced into evidence, there was still sufficient evidence to establish that the knife Walker used was a deadly weapon. In *State v. Schooler*, 2003-Ohio-6248, ¶ 19 (2d Dist.), the pocketknife used by the defendant was never introduced into evidence and there was no testimony describing the pocketknife. In finding the evidence sufficient to establish the knife was a deadly weapon, the court pointed to the injuries to the victim, as well as the defendant's threats that he was going to kill the victim. *Id.* at ¶ 25. This case is similar to *Schooler* in that the knife Walker used caused a serious injury to S.A.'s hand. (Tr. Vol. I at 38-39, 108). Also, during the assault, Walker threatened to cut S.A.'s throat. Thus, there was sufficient evidence to establish that Walker's knife was a deadly weapon.

{¶ 37} Having found that Walker's convictions were supported by sufficient evidence, we also cannot say that the trial court lost its way in convicting Walker on all four counts. Walker's convictions are not against the manifest weight of the evidence. Initially, it should be noted that "a prerequisite for any reversal on manifest-weight grounds is conflicting evidence, more specifically, evidence weighing heavily against the conviction, such that the jury clearly lost its way and created such a manifest miscarriage of justice." (Internal quotation marks deleted and citations omitted.) *State v. Tate*, 2014-Ohio-3667, ¶ 20. Furthermore, although the trier of fact may consider inconsistencies in the evidence and weigh them accordingly, such inconsistencies do not establish that a defendant's conviction is against the manifest weight of the evidence. *State v. Gullick*, 2014-Ohio-1642, ¶ 10 (10th Dist.).

{¶ 38} Here, Walker has not identified any major conflicts in the evidence. Although S.A. was unable to identify Walker at trial, she identified him nearly two years earlier in a photo lineup. Furthermore, a DNA profile consistent with Walker's was found around S.A.'s mouth and a DNA profile consistent with S.A.'s was found in blood stains on the clothes Walker was wearing at the time of his arrest. At the time of his arrest, Walker was wearing the same clothes as the individual depicted in the Pri-Value security camera video. It is clear from the totality of the evidence that it was Walker who entered Pri-Value that day. The only issue left to consider is the credibility of S.A.'s version of events.

{¶ 39} "Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact." *State v. Marshall*, 2022-Ohio-4693, ¶ 50 (10th Dist.). The trial court was in the best position to determine S.A.'s credibility. *Id.* S.A.'s version of events was supported by the physical evidence and the brief snippets of video from Pri-Value's security camera. In his argument, Walker points to the limited video and asserts that the DNA evidence is inconclusive, but these are not reasons to find S.A.'s testimony lacking in credibility. (Appellant's Brief at 2-3.) Additionally, although S.A.'s testimony conflicted on the issue as to whether Walker was attempting to rape her vaginally or anally, her confusion was understandable given the circumstances of the assault. The allegation that Walker attempted to rape her vaginally was supported by the DNA evidence and the SANE examination. "A conviction is not against the manifest weight of the evidence simply because the jury believed the state's version of events over the appellant's version." *State v. Edwards*, 2025-Ohio-112, ¶ 26 (10th Dist.). In sum, this is not one of the exceptional cases where the evidence weighs heavily against the convictions.

{¶ 40} For these reasons, we overrule Walker's sole assignment of error.

## V. CONCLUSION

{¶ 41} Having overruled Walker's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

EDELSTEIN and DINGUS, JJ., concur.

————————————