[Cite as *State v. Jewell*, 2026-Ohio-2062.]

Released 5/26/26

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | |
| Plaintiff-Appellee, | : | Case No. 23CA4047 |
| | : | |
| v. | : | |
| | : | DECISION AND JUDGMENT |
| TERRY A. JEWELL, | : | ENTRY |
| | : | |
| Defendant-Appellant. | : | |

_____

APPEARANCES:

Valerie M. Webb, The Law Office of Valerie M. Webb, LLC, Portsmouth, Ohio, for appellant.

Shane A. Tieman, Scioto County Prosecuting Attorney and Jay Willis, Scioto County Assistant Prosecuting Attorney, Portsmouth, Ohio, for appellee.

_____

Smith, P.J.

{¶1} Terry A. Jewell appeals the September 14, 2023 Judgment Entry of the Scioto County Court of Common Pleas. Jewell was convicted by a jury of several counts including murder and felonious assault, along with firearms specifications. Mr. Jewell challenges the sufficiency and the manifest weight of the evidence supporting his convictions. Based upon our review, however, Jewell's contentions are without merit. Accordingly, both

assignments of error are overruled.  The judgment of the trial court is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

{¶2} On February 27, 2022, Rodney Queen, a resident of Straight Fork Road in Scioto County, Ohio, was shot in the head.  On the same date, Mr. Jewell was arrested and brought to the Scioto County Jail for questioning.  Sadly, Mr. Queen succumbed to his injuries and died on March 1, 2022.

{¶3} On April 11, 2022, Jewell was indicted as follows:

| | |
|---|---|
| Count One: | Murder, R.C. 2903.02(A)(B), Unclassified felony; |
| Count Two: | Murder, R.C. 2903.02(B), Unclassified felony; |
| Count Three: | Felonious Assault, R.C. 2903.11(A)(1); Felony of the second degree; |
| Count Four: | Felonious Assault, R.C. 2903.11(A)(1); Felony of the second degree; |
| Count Five: | Having Weapons While Under Disability, R.C. 2913.13(A)(3), Felony of the third degree; |

and,

| | |
|---|---|
| Count Six: | Having Weapons While Under Disability, R.C. 2913.13(A)(4), Felony of the third degree. |

Counts One through Four contained firearms specifications pursuant to R.C. 2941.145 (A).

{¶4} Jewell pled not guilty and eventually proceeded to jury trial beginning on August 28, 2023.  At the conclusion of trial, Jewell was convicted on all counts.  The trial court sentenced Jewell on August 30, 2023.

{¶5} At sentencing, the trial court found that the crimes charged in Counts One through Four were crimes of similar import and should be merged for the purposes of sentencing.  The State elected that Jewell be sentenced on Count Two Murder.  The trial court also found that the crimes charged in Counts Five and Six were crimes of similar import and should be merged for purposes of sentencing.  The State then elected that Jewell be sentenced on Count Five.  The trial court thereafter concluded that the crimes charged in Count Two and Count Five were crimes of dissimilar import and should not merge.

{¶6} The trial court imposed a prison term of 15 years to life on Count Two.  The trial court also imposed a prison term of three years as a mandatory and consecutive term on the firearm specification.  As to Count Five, the trial court imposed a prison term of 24 months to be served consecutively.  Jewell's aggregate prison term was 20 years to life.  Jewell was given jail credit for 594 days.  He was ordered to pay all costs of prosecution.

{¶7} This timely appeal followed.

{¶8} We set forth below, through the testimony of the trial witnesses, the facts underlying the death of Mr. Queen.

ASSIGNMENTS OF ERROR

I.      APPELLANT'S CONVICTIONS SHOULD BE REVERSED BECAUSE THERE IS INSUFFICIENT EVIDENCE TO SUPPORT THE FINDING OF GUILTY BEYOND A REASONABLE DOUBT.

II.     APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND SHOULD BE REVERSED.

Standard of Review

{¶9} In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *See State v. Steele,* 2025-Ohio-5730, at ¶ 22, citing *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as

being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Const. Co.,* 54 Ohio St.2d 279 (1978), syllabus.

{¶10} The weight and credibility of evidence are to be determined by the trier of fact. *State v. Kirkland,* 2014-Ohio-1966, ¶ 132. The trier of fact "is free to believe all, part or none of the testimony of any witness," and we "defer to the trier of fact on these evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility." *State v. Dillard,* 2014-Ohio-4974, ¶ 28 (4th Dist.), citing *State v. West*, 2014-Ohio-1941, ¶ 23 (4th Dist.).

{¶11} In addition, "[a] verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's witnesses." *State v. Chancey*, 2015-Ohio-5585, ¶ 36 (4th Dist.), citing *State v. Wilson*, 2014-Ohio-3182, ¶ 24 (9th Dist.), citing *State v. Martinez*, 2013-Ohio-3189, ¶ 16 (9th Dist.). Moreover, " '[w]hile the jury may take note of inconsistencies and resolve or discount them accordingly, * * * such inconsistences [sic] do not render defendant's conviction against the manifest weight or sufficiency of the evidence.' " *State v. Corson*, 2015-Ohio-5332, ¶ 31 (4th Dist.), quoting *State v. Proby*, 2015-Ohio-3364, ¶ 42 (10th Dist.), citing *State v. Gullick*, 2014-Ohio-1642, ¶ 10 (10th Dist.).

{¶12} " 'When an appellate court concludes that the weight of the evidence supports a defendant's conviction, this conclusion necessarily includes a finding that sufficient evidence supports the conviction.' " *Steele* at ¶ 25, quoting *State v. Wickersham,* 2015-Ohio-2756, ¶ 27, citing *State v. Pollitt,* 2010-Ohio-2556, ¶ 15 (4th Dist.). *See also* State v. Coleman, 2026-Ohio-666, at ¶ 20. A determination that a conviction is not against the manifest weight of the evidence is therefore dispositive of the issue of whether the evidence is sufficient to sustain a conviction. *Id*., citing *State v. Lombardi*, 2005-Ohio-4942, ¶ 9 (9th Dist.). Therefore, in the instant case, we consider both assignments of error jointly, beginning with Jewell's argument that his convictions are against the manifest weight of the evidence.

Evidence Presented at Trial

Phillip Duncan - Scioto County Sheriff's Office

{¶13} Phillip Duncan served as the 911 dispatcher who took a call from Terry Jewell. Duncan identified State's Exhibit 1, a recording of the 911 call from Jewell. We set forth the questioning about the call which took place at trial:

Q:     Mr. Jewell starts off the call by literally saying, "I accidentally

shot my friend," correct?[1]

A:     Yes.

Q:     And you say, "Where'd you shoot him at bud," and he starts to give you an address at "Umm, 410 Straight Fork- - Straight Fork. I did. I didn't mean to," and you then repeat 410 Straight Fork. He says, "Yes. Yes." You say, "Where did you shoot him at?" He replies, "I don't know where the fuck I shot him at. It was crazy. I didn't even mean to." Is that correct?" Did I - -

A:     Correct.

Q:     Okay. And then a little later on he - - he tries to transition and claim that it was a game of Russian Roulette; true?[2]

A:     Correct.

Q:     Now, moving further into the call, there is one point where Mr. Jewell indicates I grabbed it, got it away from him, I threw it down, and he fucking shot himself, or shot his self is how he phrased it. Is that correct?

A:     Correct.

Q:     And then a little later on from there when you say, "Can you tell me where he shot himself at, Terry," he screams, "I don't know, man." And your response, if I am hearing it correctly is, "Terry, how do you not know. How do you not know? You were sitting right beside him, and you see blood. Where's the blood coming from," and Mr. Jewell replies, "No, I was sitting across from him, man." Is that true?

---

[1] We have listened to the 911 call in its entirety, and the quality of the recording is very good. At the start of the call, in addition to his statement that he accidentally shot his friend, Mr. Jewell continues, "He's alive. Need to get here right away to help keep him alive."

[2] Throughout the 911 call, Mr. Jewell repeatedly cries, "Hurry, hurry, hurry." He also repeats "he was shooting at me, shooting at his self." He also states that Mr. Queen threatened him.

A:     Correct.

Q:     Okay.  And really the next thing I want to bare [sic] out is Mr. Jewell several times pointed out that he has Mr. Queen on the porch, I dragged him out on the porch; correct?

A:     Correct.

Q:     So, he - - he dragged him from there.  And then at another point on this February night, he says, "I got him naked as jaybird;" right?

A:     Right.

Q:     And then makes some comment in the middle about hoping the cold helps him somehow?

A:     Right.

Q:     But this gentleman is suffering from a head wound, lying on a front porch with, according to your call, no clothes on; is that correct?

A:     That's the way I interpreted it.

Our review of the 911 call also indicates that towards the middle of the approximately 18-minute recording, one can hear a person, presumably Mr. Queen, moaning.  The moaning sound continues until near the end of the recording.  We note that when Officer Duncan asks Mr. Jewell where the gun is, he first states "I don't know."  We also note that when the officers arrive and inquire about the gun, Mr. Jewell initially responds that he doesn't know where it is, but then shortly thereafter states, "gotta be right

there in the living room, man." Mr. Jewell also advises the officers, "ain't nobody in there, man."

General Observations as Testified by Responding Officers

{¶14} Officers Ethan Carmichael, Brian Nolen, Martin Potts, and Kirk Jackson responded to the call for assistance at 410 Straight Fork Road.[3] These officers identified Terry Jewell in the courtroom. Officers Carmichael, Nolen, and Potts testified that Queen was lying on the porch when they arrived, making gurgling sounds and moaning, but saying nothing intelligible. These officers also noted that Mr. Queen was wearing a T-shirt and no pants. Officers Potts and Nolen testified that something was wrapped around Mr. Queen's head.

{¶15} Officers Nolen and Potts testified that Jewell was standing on the front porch and that he declined medical treatment for himself. Officers Carmichael, Nolen, and Potts also testified that they smelled alcohol on Mr. Jewell, and that he appeared to be impaired. Carmichael testified that Mr. Jewell had no observable injuries.

{¶16} Officers Carmichael and Nolen testified there was blood on the living room couch. Officers Carmichael, Nolen, and Jackson described a "blood trail" leading from the porch where Queen was lying to the couch.

---

[3] It appears a Deputy Koenig also responded to the incident, but this officer did not testify at trial.

Officers Potts and Jackson took photographs of the crime scene. Officers

Carmichael and Nolen testified that Carmichael (wearing gloves) obtained

the gun involved and gave it to Nolen, who secured it in his vehicle.

Ethan Carmichael - Scioto County Sheriff's Office

{¶17} Ethan Carmichael testified he served in Road Patrol on the date

of the incident. Upon arrival, he walked up the porch steps and observed

Rodney Queen lying with an apparent injury to the right side of his head.

Mr. Jewell informed there was no one else in the house and that the gun

involved was on the living room table. Officer Carmichael testified the gun

lying on the coffee table was in the direction of a blood-stained couch.

{¶18} Carmichael testified that once the gun was secured, medical

personnel were safe to enter the premises. Officer Carmichael identified

State's Exhibit 3, the weapon he found. He also identified State's Exhibit 4,

a picture Deputy Potts took before Carmichael removed the gun from the

table. He testified the gun in Exhibit 3 and the gun in the photographs,

Exhibit 4, were the same.

Deputy Sergeant Brian Nolen - Scioto County Sheriff's Department

{¶19} Deputy Nolen, a 33-year veteran of law enforcement, testified

he was dispatched to Straight Fork Road on report of a self-inflicted gunshot

wound during Russian Roulette. He testified he was the last officer to arrive

at the scene and, as soon as he did, Deputy Carmichael met him with the

gun.  Deputy Nolen also identified the firearm, State's Exhibit 3, that he

secured in the trunk of his cruiser.

{¶20} After this, he returned to the porch where Mr. Queen was lying

outside with a blanket around his head and lots of blood.  Deputy Nolen

testified as follows:

> Asking him what happened, he kept saying I don't know, screaming, help my friend.  I then asked why is he here.  He screamed at me that he drug him there, trying to get him to the car to take him to the hospital for help.  He then screamed even louder that's as far as he could get him because he was by himself, he had no help, and Mr. Queen was heavier than he looked.

{¶21} Mr. Jewell also advised that only Mr. Queen and he had been

present.  Deputy Nolen testified that initially he did not know what had

happened except that dispatch had indicated it was a self-inflicted wound.

Deputy Nolen was attempting to confirm that it was self-inflicted.  At that

time, he did not consider Jewell a suspect.  However, Jewell became more

upset and animated, so Deputy Nolen asked Jewell to walk to the car with

him.

{¶22} Deputy Nolen testified as they walked to the car, Mr. Jewell

stated:

> Look man, he pointed the gun at my head, pulled the trigger twice.  It didn't go off.  I had to take the gun

away from him and it went off."  I immediately Mirandized him, asked him if he understood his rights.  He said, "Yes."  I asked him if he had shot Mr. Queen.  He said, "No, Mr. Queen shot himself."

Nolen testified the above comments immediately changed his view as to Jewell's role in the situation because it didn't match the dispatch report. Jewell was then placed in the cruiser.  Deputy Nolen stayed on the scene until Detective Jackson arrived.  Then he turned the crime scene over to Detective Jackson.

{¶23} Deputy Nolen testified that the physical evidence, a large pool of blood between the left and middle couch cushions, caused him to believe that's where Mr. Queen was shot.  He identified State's Exhibit 16, a photograph of the blood on the couch.  He also identified State's Exhibit 5 as two empty shell casings and one live round that he removed from the gun that Deputy Carmichael gave him.  State's Exhibit 6 was identified as the evidence routing form for a .38 Smith and Wesson, the gun he turned into evidence.  He identified State's Exhibit 7, the evidence routing form for a Winchester 38 spent casing and the live round.

{¶24} Deputy Nolen also described the game of Russian Roulette.  He found three rounds in the gun, two which had been fired.  He opined that it was not a typical game of Russian Roulette.  On cross-examination, defense

counsel attempted to elicit testimony that Mr. Jewell was by himself *only* at the time he moved Mr. Queen to the porch.

### Corey Carver

{¶25} Corey Carver was employed by the Scioto County Sheriff's Office on the incident date. He identified State's Exhibit 32, the booking sheet for Mr. Jewell. Carver testified that as Mr. Jewell was changing clothes at the jail, he heard Mr. Jewell "talking to himself." Carver asked him what he said, and Mr. Jewell replied, "I shot the mother fucker."

{¶26} On cross-examination, defense counsel inquired as to why Mr. Carver no longer worked for the sheriff's office. Mr. Carver testified he quit due to his mental state. On redirect, Mr. Carver clarified that he did not quit until June of 2022, five months later.

### Deputy Martin Potts - Scioto County Sheriff's Department

{¶27} Deputy Potts testified he was dispatched to Straight Fork Road shortly after midnight. He had to open a gate to get the cruisers up the driveway to the residence. Mr. Jewell was standing on the front porch, speaking with Deputy Koenig. Mr. Queen was laying prone with his head facing up on the front porch. A shirt or blanket was wrapped around his head. Deputy Potts observed blood on the fabric. He identified State's Exhibits 25 and 26 showing injury to the right side of Mr. Queen's head.

{¶28} Deputy Potts testified his main responsibility was to take photographs, although Detective Jackson also took pictures. He identified State's Exhibit 4, a photograph of a gun on a coffee table. Once he took the photograph of the gun, Deputy Carmichael collected it for evidence.

{¶29} Deputy Potts testified that he transported Mr. Jewell to the jail. At this point, Deputy Potts described a conversation he had with Mr. Jewell en route:

> Well, I was advised by Sergeant Nolen that Mr. Jewell was willing to take a gunshot residue (GSR) test. I went back to the cruiser, got all the equipment needed for it, which is just a small test kit, approached the vehicle, opened up the door, asked him if he was ready to take the test and to present his hands to me. He asked me what the test involved. And I described the procedure which we collect the sample off of his hand…And what exactly we would be looking for and its purpose…And he advised me at that point that he was no longer consenting to a GSR test. So, I closed the door.

{¶30} The prosecutor spent time going through various photographs with Deputy Potts. We have also reviewed those exhibits, and we will relay Deputy Potts testimony about the photographs very generally. Deputy Potts identified multiple photographs taken of the coffee table; the bloody couch; a bloody rocking chair located to the left of the couch; blood pooling between the middle and left cushions of the couch; broken glass on an end table near the end of the couch; blood on the floor leading out of the house;

blood on the front porch where Mr. Queen was discovered; and the bloody injury to the right side of Mr. Queen's head. Deputy Potts testified the photographs he took were taken as soon as he entered the residence on the day of the shooting. Potts testified that Detective Jackson also took his pictures on the same date.

{¶31} On cross-examination, Deputy Potts admitted that he did not consider getting a search warrant to compel the gunshot residue test. He admitted he did not take pictures of the wall, and he did not notice blood on the wall.

{¶32} On redirect, Deputy Potts testified that if he had waited for a search warrant, it could compromise the test results. On recross, Deputy Potts admitted that Mr. Jewell was in handcuffs so they could have prevented him from washing his hands or using sanitizer.

Observations of Responding Medical Personnel

Derek Howell - Union Township Volunteer Fire Department

{¶33} Mr. Howell testified that when he reached 410 Straight Fork Road, he found a semi-responsive male lying on the porch. A deputy was trying to hold pressure to the person's head. Howell was advised of a possible gunshot wound. The patient followed simple commands short-term, but also "flailed" his arms. Howell described treating the patient for

shock, administering IV fluids, bandaging his head, and immobilizing him with a neck brace and backboard. It was quickly determined that the patient needed a higher level of care, so a helicopter was requested. Mr. Howell identified Exhibit 29, a patient care report (run report) for Rodney Queen.

Derek Lykins

{¶34} Mr. Lykins, a flight nurse paramedic from Air Evac, Georgetown, Ohio, responded to the call regarding a possible gunshot wound or head wound. The male patient was confused, bleeding profusely, pulling at his tubes and wires, and combative. Nurse Lykins and his partner decided to intubate Mr. Queen. They also provided further wound treatment to his head. Mr. Queen was transported to St. Mary's Medical Center in West Virginia. Mr. Lykins identified State's Exhibits 30, and 31, the flight bill and run report for Rodney Queen.

Brandy Markova - Daughter of Mr. Queen

{¶35} Ms. Markova resides in Portsmouth, Virginia. Rodney Queen was her biological father. Markova testified her parents were teenagers when she was born and she only saw him several times as a child. Queen attended her high school graduation and party. Markova actually developed a relationship with her father when they both attended Shawnee State University.

{¶36} Markova testified they remained in regular contact after college. She denied that her father ever indicated self-harm. Markova learned about the shooting by phone call. Although initially unaware of the seriousness of his injuries, she immediately traveled to the hospital in West Virginia. Once there, she learned his injuries were critical. Markova testified her father was "unrecognizable," and she never thought he would survive. Markova had briefly left the hospital when she received a call to return immediately. Markova was then told that her father was braindead and it would be best to remove him from life support.

Testimony from Investigating Officers

Detective Sergeant Jodi Conkel - Scioto County Sheriff's Department

{¶37} Detective Conkel testified that she also works as a detective for the Scioto County Prosecutor's Office, Special Victims Unit. In this case, she assisted Detective Jackson by interviewing Terry Jewell on February 27, 2022, just a few hours after he was taken into custody.

{¶38} Detective Conkel testified that when she interviewed Mr. Jewell, he had two abrasions on his head, "scabbed over," so she did not think they were fresh injuries. There was a scrape mark down the side of his neck which looked fresh. Conkel identified these injuries in a photograph, State's Exhibit 98.

{¶39} Detective Conkel also identified State's Exhibit 38, a copy of the video interview with Mr. Jewell. Mr. Jewell immediately asked, "How's my friend doing? That's what I want to know." However, Detective Conkel began by going over the Miranda rights with him. After Jewell acknowledged the rights as explained, Detective Conkel indicated that Mr. Queen was at the hospital, and "as of right now, yes he's okay." Jewell responded, "Oh, thank God."

{¶40} We have reviewed the trial transcript and the actual recorded interview. Generally, Jewell tells Detective Conkel that Queen and he had been friends since 2017. Jewell was staying there to help Queen, who had heart problems. Prior to the shooting, Jewell had stayed there about a week. Jewell stated that he slept in a bedroom and Queen slept on the living room couch.

{¶41} On the night of the shooting, Jewell told Detective Conkel that both men had been drinking alcohol. Jewell claimed he did not know Queen had a handgun. Jewell repeatedly indicated that he did not know what happened. He did not know what type of handgun was used. Then he stated that Mr. Queen shot himself. He repeatedly denied shooting Queen or being in an argument with Queen. When Detective Conkel commented that the

two men argued frequently because the Scioto Sheriff's Office had been

called on them before, Jewell agreed.

{¶42} Detective Conkel summarized the recorded interview as

follows:

> Yeah…And I basically told him to tell me what had taken place. He was all over the place. The - - the version of what took place changed multiple times. Sometimes they were self-serving. It went - - there's some talk about him shooting himself. I asked him about when he called 911, because before I had interviewed him, I had listened to the 911 call where he had called in and said he shot his friend. He denied that. I was also given information from the jail staff that he admitted to them that he shot him. He denied that as well. He - - some stuff he could remember. Some stuff he couldn't. He kept saying that they were intoxicated. They'd been drinking. They hadn't been fighting. I really don't know what happened. Kind of just all over the place.

{¶43} Based on our review of State's Exhibit 38, along with the trial

transcript, we would agree with Detective Conkel's summary of the topics

discussed during Jewell's interview. We would also note that Mr. Jewell

attempted to portray Mr. Queen as an unhappy, unstable, and depressed

person who had shot a pistol by both of Mr. Jewell's ears in the past and

who had also previously struck Mr. Jewell with the butt of his rifle. Mr.

Jewell explained that Queen was once "happy-go-lucky," but in the previous

year he had lost his mother and wife. Mr. Queen also had heart problems

and financial problems. He needed help on his farm. Mr. Jewell explained

that despite the change in Mr. Queen's personality, he loved his friend, had a sense of loyalty to him, and was willing to help out on his farm. Mr. Queen had given Jewell a place to stay to "get back on his feet."[4]

{¶45} Detective Conkel also described the Scioto County Jail phone system, explaining that all calls are monitored. She testified that Mr. Jewell made a recorded phone call on March 3, 2022 to, Detective Conkel believed, an ex-girlfriend. Detective Conkel identified State's Exhibit 54, a copy of the recorded phone call. The phone call was played for the jury. Detective Conkel summarized the conversation as follows:

> So, basically, he is talking to this female and he's telling her it wasn't premeditated. They're talking about the charges being jacked up. She mentioned something about maybe it will be manslaughter. He said, "No, maybe involuntary manslaughter." She at one point says you didn't tell me you shot him. He said "I don't want to talk about it. He pulled a gun out on me. That's what happened. It's a big fucking mess." He said, "I know it." He said, I - - or she even makes the comment, "I don't even want to be talking to you." Like, she's leery to even be talking to him on the phone. He says, "I don't know how I'm going to live with this." She says, "I doubt you're coming out. If you get 15 years." He said, "Well, I'm only 54." She goes on to say, "Add 54 and 15 together. You won't live to be 70 in prison." There's talk about - - or he says, "It's not murder. Murder has to be planned." And that's basically the just [sic] of the phone call.

---

[4] During the interview, Mr. Jewell mentioned persons named "Doug," "Roy," and "Brian," whom Mr. Queen and he had interacted with in the days and hours leading up to the shooting.

Detective Conkel testified that during the jail phone call, Mr. Jewell did not cry or show remorse over Mr. Queen's death. Our review of the jail phone call indicates that the female Jewell is speaking to asks, "Where did you shoot him at?" Jewell replies, "I don't want to get into details." Then the female asks, "Where did he get hit?" Jewell replies, "I don't know exactly."

{¶45} On cross-examination, Detective Conkel admitted that she was not present at the incident scene or at the jail when Mr. Jewell allegedly made the incriminating statements.

Adam Giles - Scioto Count Sheriff's Office

{¶46} Detective Giles testified the extent of his involvement was test-firing the weapon seized and assisting in execution of a search warrant at 410 Straight Fork Road on March 31, 2023.[5] Giles' testimony began with his identification of State's Exhibit 3, the Smith and Wesson Model 36, "Chief's Special." Detective Giles test-fired the gun and determined it was functional.

{¶47} Detective Giles assisted others in executing the search warrant obtained by Detective Jackson. Giles testified they were looking for clothing and a fired bullet or casing. Detective Giles testified there was a

---

[5] We perceive this date to be a scrivener's error as the record and other testimony indicate the search warrant was executed on March 31, 2022.

horse picture on the wall behind the couch in the living room. The corner of the picture frame and picture appeared to have been penetrated. They removed the picture, and something had hit the wall and trim behind it. Detective Jackson noticed a fired fragmented bullet lying on the ground where the marks were, coinciding with the picture and mark on the wall.

{¶48} Detective Giles identified State's Exhibit 41, the horse picture. He testified the bottom right corner of the picture appeared to be penetrated by a bullet. He agreed that the holes through the cardboard, frame, matting material, and picture itself were consistent with having been penetrated by a bullet.

{¶49} Detective Giles identified several photographs taken by Detective Jackson, including State's Exhibits 63, 64, and 65, photographs of the horse picture hanging on the wall. State's Exhibits 74, 75, 76, and 77, showed the back of the picture with a hole in it. Detective Giles also identified photographs showing the dented wall. State's Exhibit 82 was the fired bullet, deformed from hitting the wall. State's Exhibit 42 was the spent projectile lying on the photograph.

{¶50} On cross-examination, Detective Giles testified that a gun has to be held tightly in order to be fired. He admitted that it was impossible for

him to identify the caliber of the bullet on the floor.  He admitted he did not do further testing to determine the angle of entry of the bullet in the picture.

{¶51} On redirect, Detective Giles clarified that as long as the trigger is engaged and the hammer drops, a gun will fire.  The bullet will travel in the direction the muzzle is pointed at the time the trigger is pulled.  The bullet goes where the gun is aimed.

Detective Kirk Jackson - Scioto County Sheriff's Department

{¶52} Detective Kirk Jackson testified that he was the lead investigator.  He took photographs on February 27, 2022 and March 31, 2022.  He identified State's Exhibit 39, an exterior photograph of the residence at 410 Straight Fork Road.  Exhibit 27 showed the front porch and blood leading to the door.

{¶53} State's Exhibit 40 was a sketch Detective Jackson drew, showing a basic layout of the scene and the physical evidence.  He testified that Mr. Queen was not present when he arrived at the Straight Fork Road residence.  Based on the physical evidence, however, Detective Jackson concluded that Mr. Queen had been lying on the porch.  A blood trail began on the porch and ended at the couch in the living room, where there was a major accumulation of blood.

{¶54} Detective Jackson identified various photographs of the house, the living room, the couch, and the horse picture. On February 27, 2022, he observed flakes of glass on the arm of the couch which appeared to have come from the damaged horse painting. The couch was directly underneath the painting.

{¶55} Detective Jackson identified State's Exhibit 97, a piece of trim and paneling he removed from the wall. He pointed out a dented portion. The wall was removed from behind the horse picture and couch. State's Exhibit 83 was a picture of the paneling. He also identified State's 42, the actual spent bullet, and State's Exhibit 86, a photograph of the bullet. State's Exhibit 94 was a photograph of the projectile on the floor and the paneling pulled off the wall directly beneath it. State's Exhibits 88 and 89 were sweatpants obtained from the living room floor, with possible bloodstains. Detective Jackson admitted the stained sweatpants were not tested. Detective Jackson testified he included two counts of weapons under disability, based on the Jewell's computerized criminal history (CCH).[6]

{¶56} On cross-examination, defense counsel attempted to elicit testimony that between February 27, 2022, the night of the shooting, and

---

[6] At this point, defense counsel objected as to any testimony based on the CCH. After some discussion, the trial court overruled the objection but cautioned the prosecutor to lay a foundation. Detective Jackson identified State's Exhibit 36, a plea of guilty document and a judgment entry of guilty from Adams County Common Pleas Court to two counts of trafficking in drugs, felonies of the fifth degree.

March 31, 2022, when the warrant was executed, the residence was left unsecured. Detective Jackson testified he did not know the answer. He admitted the residence was not blocked off with tape nor was a guard posted. He also admitted that he did not actually know when the horse picture was shot. He admitted he did not know the angle of entry of the bullet. He admitted that no testing was done on the sweatpants. Detective Jackson testified that the bullet was too deformed to be tested.

{¶57} On redirect, Detective Jackson testified the gate leading to the residence and the residence were locked when he returned to execute the warrant. He had to get keys from a relative.

Forensic Evidence

Steven Weichman - Ohio Bureau of Criminal Investigation (BCI)

{¶58} Mr. Weichman identified State's Exhibit 43, his curriculum vitae. The trial court qualified him as an expert in the field of DNA analysis. Weichman also identified State's Exhibit 44, the DNA lab report he prepared in this case. Mr. Weichman explained the process of receiving, logging, and maintaining evidence. He testified that five pieces of evidence were analyzed: DNA from Mr. Queen; DNA from Mr. Jewell; DNA from a firearm; and DNA from two knives.

{¶59} Weichman explained that a DNA mixture is a profile consisting of DNA from more than one person. A DNA mixture was obtained from the firearm. Rodney Queen, the owner of the firearm, was a major contributor to the DNA mixture. Weichman excluded Terry Jewell as a major contributor to DNA on the weapon. However, Weichman testified that he could not make any conclusions with respect to Mr. Jewell as a minor contributor to the DNA mixture. He testified, however, it is possible to touch or use an item without leaving DNA of sufficient quality for identification. Mr. Weichman admitted that although the circumstantial evidence indicated that Mr. Jewell fired the gun, Mr. Weichman, in actuality, had "no idea" who handled the firearm. This testimony was again elicited on cross-examination.

Sean Swiatkowski - Montgomery County Coroner's Office

{¶60} Dr. Swiatkowski identified State's Exhibit 45, a copy of his curriculum vitae. After explaining his background and credentials, the trial court identified Dr. Swiatkowski as an expert in the field of Forensic Pathology. He also identified State's Exhibit 99, a copy of the toxicology report generated from the toxicology laboratory at the Montgomery County Coroner's Office. The report showed that fentanyl and norfentanyl was

found in the cavity blood from Mr. Queen.  Dr. Swiatkowski acknowledged that Mr. Queen was on a fentanyl drip for the last few days of his life.

{¶61} Dr. Swiatkowski identified State's Exhibit 46, a report of preliminary autopsy findings prepared immediately after autopsy.  He explained that a final report is prepared after he is able to review toxicology reports, medical records, and receive a history.  The preliminary report indicated an "indeterminate range gunshot wound of the head."  He explained that the reasons the word "indeterminate" is used at times is because a body does not exhibit gunpowder burns.  The barrel of the gun is far enough away that nothing hits the skin.  Therefore, the examiner cannot determine if the person was shot from a distance of 10, 20, or 30 feet.  Dr. Swiatkowski also noted that Mr. Queen had some lacerations, abrasions, scrapes, contusions, bruises, and heart disease.

{¶62} Dr. Swiatkowski identified State's Exhibit 46 as his final autopsy report.  He also identified State's Exhibit 53, an x-ray taken prior to the examination to show any evidence inside the body.  The x-ray showed the bullet fragments, Dr. Swiatkowski recovered during the autopsy, one in the scalp and one further back in the skull.  He testified he found the final cause of death to be "distant or indeterminant gunshot wound of the head."

{¶63} Dr. Swiatkowski testified the body did not exhibit " stippling" (gunpowder burns causing abrasions). Dr. Swiatkowski opined that there was no way Mr. Queen could have shot himself.

{¶64} Dr. Swiatkowski identified State's Exhibit 47, a photograph of two vials containing the bullet fragments with identifying information. He opined that there was actually one bullet that separated. He also opined that there were possibly three fragments. He opined the bullet traveled front to rear, progressing downward. He identified State's Exhibits 51 and 52 as photographs of the bullet fragments.

{¶65} Dr. Swiatkowski identified State's Exhibit 49 and 50, a photograph of Mr. Queen's wounds. Exhibit 50 demonstrated the exit wound. Dr. Swiatkowski testified that he is familiar with wounds incurred as a result of playing Russian Roulette. He opined that Mr. Queen's wounds were not typical of those types of wound. He explained that in Russian Roulette, typically, the barrel of the gun is placed against the skull and goes straight in, not angled. Also, a Russian Roulette-type wound would show searing or soot.

{¶66} On cross-examination, Dr. Swiatkowski testified it was impossible to determine the distance without having a test fire of the weapon. On redirect, the prosecutor showed Dr. Swiatkowski State's

Exhibit 3, the short-barreled .38-special revolver, and asked several questions. While defense counsel objected on the basis that Dr. Swiatkowski had not been qualified as a ballistic or firearm expert, the objection was overruled. Dr. Swiatkowski testified that with a shorter weapon, it was much harder for the bullet to burn as it goes through the barrel and hits the air. However, the presence of any burned powder depends on the ammunition and the test fire.

{¶67} At the conclusion of Dr. Swiatkowski's testimony, the State rested. Defense counsel made a Crim. R. 29 motion and a motion to exclude Mr. Jewell's statements. Counsel argued that the alleged confessions should be disregarded because no physical evidence tied Mr. Jewell to the murder. The only link was the incriminating statements. Thus, counsel argued there was not sufficient compliance with the corpus delecti rule. The trial court overruled the motions. Mr. Jewell declined to testify. Thereafter, the defense rested.

## Analysis

{¶68} We begin by clarifying that Mr. Jewell very generally challenges the weight and sufficiency of the evidence supporting his six convictions. In *State v. Foster*, 2023-Ohio-746, at ¶ 22 (4th Dist.), while addressing a similar argument, we observed that although the trial court

found Foster guilty of trafficking and possessing cocaine, the trial court merged the possession offense with the trafficking offense. Thus, if sufficient evidence supported Foster's trafficking conviction, an erroneous verdict on the merged count would be harmless. *See State v. Whitehead,* 2022-Ohio-479, at ¶ 78 (4th Dist.); *State v. Worley*, 2021-Ohio-2207, ¶ 73; *State v. Powell*, 49 Ohio St.3d 255, 263 (1990); *State v. Campbell,* 2021-Ohio-2482, ¶ 46 (4th Dist.); *see also State v. Williams*, 2012-Ohio-4693, ¶ 54 (4th Dist.) (because court does not impose sentence for merged offenses, defendant is not "convicted" of merged offenses and no "conviction" for appellate court to vacate). We noted that if we determined that sufficient evidence supported Foster's trafficking in cocaine conviction, we need not address her sufficiency argument regarding the possession offense.

{¶69} Here, several of Mr. Jewell's offenses were merged and we need not consider the merged offenses. As indicated, the trial court found that Counts One, Two, Three, and Four should be merged, and the State elected to proceed on Count Two. The trial court also found that Count Five and Count Six should be merged, with the State electing to proceed on Count Five. Therefore, we need only consider the weight and sufficiency of the evidence as to Counts Two and Five.

{¶70} Count Two, Murder with a Firearm Specification, R.C.

2903.02, provides in pertinent part:

> (B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

R.C. 2941.145, Specification Concerning Use of Firearm to Facilitate

Offense provides in pertinent part:

> (A) Imposition of a three-year mandatory prison term upon an offender under division (B)(1)(a)(ii) of section 2929.14 of the Revised Code is precluded unless the indictment, count in the indictment, or information charging the offense specifies that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense.

Count Five, Having Weapons Under Disability, R.C. 2923.13 provides in

pertinent part:

> (A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:

> (3) The person is under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse….

{¶71} In challenging the weight and sufficiency of the evidence which convicted him, Mr. Jewell admits that he gave conflicting statements as to how Mr. Queen ended up with a gunshot wound to the head while he was present with him in the living room of the residence. However, Jewell cites the lack of independent witnesses, the lack of GSR evidence, the lack of DNA testing on the sweatpants, and the lack of ballistic testing on the bullet fragment, which Detective Jackson described as "deformed," as undermining the weight and sufficiency of the evidence.[7] For the reasons which follow, we disagree.

{¶72} Because there were no witnesses to the shooting, the evidence against Mr. Jewell is largely circumstantial. It is well established that the elements of an offense may be proven by direct evidence, circumstantial evidence, or both. *See State v. Trout*, 2020-Ohio-3940, at ¶ 73 (4th Dist.); *State v. Wingfield*, 2019-Ohio-1644, at ¶ 51 (8th Dist.). *See State v. Durr*, 58 Ohio St.3d 86 (1991). Direct evidence exists when "a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition

---

[7] We also observe that in this appeal, Jewell does not challenge the background, education, or training of officers; chain of custody of exhibits; authentication of exhibits; or qualifications of experts. Thus, in the interest of brevity, we have referenced these subjects only generally within our recitation of the trial testimony.

that it is offered to establish." *State v. Cassano*, 2012-Ohio-4047, ¶ 13 (8th

Dist.). Circumstantial evidence, on the other hand, is evidence that requires

"the drawing of inferences that are reasonably permitted by the evidence."

*Id. See also State v. Hartman,* 2008-Ohio-3683, ¶ 37 (8th Dist.)

("[c]ircumstantial evidence is the proof of facts by direct evidence from

which the trier of fact may infer or derive by reasoning other facts in

accordance with the common experience of mankind").

{¶73} Circumstantial and direct evidence are of equal evidentiary

value. *See Trout supra,* at ¶ 74; *Wingfield, supra*, at ¶ 52; State v. Santiago,

2011-Ohio-1691, ¶ 12 (8th Dist.). "Although there are obvious differences

between direct and circumstantial evidence, those differences are irrelevant

to the probative value of the evidence." *Cassano* at ¶ 13, citing *State v.*

*Treesh*, 90 Ohio St.3d 460, 485 (2001). In some cases, circumstantial

evidence may be " 'more certain, satisfying and persuasive than direct

evidence.' " *State v. Lott*, 51 Ohio St.3d 160, 167 (1990), quoting *Michalic*

*v. Cleveland Tankers, Inc.,* 364 U.S. 325, 330 (1960). *See also State v.*

*Dunn,* 2017-Ohio-518, at ¶ 67 (4th Dist.); *State v. Grube*, 2013-Ohio-692 at

¶ 30 (4th Dist.). In this case, the jurors had more to consider than just the

testimonies of the lay and expert witnesses. Additionally, the State utilized

80 exhibits which included the 911 call; the firearm confiscated from the

crime scene; two shell casings and one live round; multiple photographs of the scene and evidence collected; EMS run report; evidence routing form; Air Evac run report; medical records of Rodney Queen; the actual horse picture; wood piece from the living room wall; CV's of the experts; Weichman's DNA analysis report; Swiatkowski's autopsy report; x-ray photographs of Mr. Queen's skull; CD with evidence of Jewell's incriminating jail phone call; CD of Detective Conkel's interview with Jewell; and toxicology report of Mr. Queen. Only State's Exhibits 28, 25, 37, 59, 66-68, 71-73, 80, 84- 85, 87, 90-92, 17 exhibits, were not admitted.

{¶74} Furthermore, in this case, the trial court properly instructed the jury as to the presumption of innocence and the State's burden of proof as to every element of the counts. The trial court also explained direct and circumstantial evidence and the inference which could be drawn from the evidence. The jurors were also instructed that the attorney's remarks were not evidence. It is well-established that " '[t]he jury is presumed to have followed the court's [jury] instructions.' " *State v. Ireland,* 2018-Ohio-4494, at ¶ 45, quoting *State v. Jones*, 91 Ohio St.3d 335, 344 (2001).

{¶75} We must be mindful that the weight and credibility of evidence are to be determined by the trier of fact. *See State v. Coleman,* 2026-Ohio-666, ¶20 (4th Dist.); *State v. Kirkland*, 2014-Ohio-1966, ¶ 132. The trier of

fact "is free to believe all, part or none of the testimony of any witness," and we "defer to the trier of fact on these evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility." *State v. Dillard*, 2014-Ohio-4974, ¶ 28 (4th Dist.), citing *State v. West,* 2014-Ohio-1941, ¶ 23 (4th Dist.). Although Mr. Jewell did not choose to testify, the trial court was tasked with determining his credibility based on the 911 recording, the recorded interview, and the jail phone call.

{¶76} In addition, " '[a] verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's witnesses.' " *Coleman, supra,* quoting *State v. Chancey*, 2015-Ohio-5585, ¶ 36 (4th Dist.), citing *State v. Wilson,* 2014-Ohio-3182, ¶ 24 (9th Dist.), citing *State v. Martinez,* 2013-Ohio-3189, ¶ 16 (9th Dist.). Moreover, " '[w]hile the jury may take note of inconsistencies and resolve or discount them accordingly, * * * such inconsistences [sic] do not render defendant's conviction against the manifest weight or sufficiency of the evidence.' " *State v. Corson*, 2015-Ohio-5332, ¶ 31 (4th Dist.), quoting *State v. Proby*, 2015-Ohio-3364, ¶ 42 (10th Dist.), citing *State v. Gullick*, 2014-Ohio-1642, ¶ 10 (10th Dist.).

{¶77} Pursuant to the standard of review for a manifest weight challenge, we must defer to the trier of fact on the evidentiary weight and credibility of the lay and expert witnesses who testified at Jewell's trial. It is obvious that the jury believed the State's hypothesis as to how Mr. Queen ended up with a gunshot wound to the head. It is obvious that the jury found that Mr. Jewell caused Mr. Queen's death while attempting to commit an offense of violence, by using a firearm to facilitate the offense, and by using the firearm while knowing that he had been convicted of a felony offense of possession of drugs.

{¶78} Based upon the foregoing, we cannot find that the jury created a manifest miscarriage of justice requiring vacation of Mr. Jewell's convictions and a new trial. Thus, we cannot find that Mr. Jewell's convictions are against the manifest weight of the evidence. Moreover, because his convictions are supported by the manifest weight of the evidence, we necessarily find that the convictions are also supported by sufficient evidence. Mr. Jewell's assignments of error are without merit. Accordingly, the judgment of the trial court is affirmed.

**JUDGMENT AFFIRMED.**

## JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hess, J. and Wilkin, J. concur in Judgment and Opinion.

> For the Court,
>
> _____
>
> Jason P. Smith
> Presiding Judge

## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 22, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**